796 P.2d 866

**STATE of Arizona, Appellee,**

v.

**Jimmy Lee MATHERS, Appellant.**

**No. CR–88–0001–AP.**

Supreme Court of Arizona,
En Banc.

June 26, 1990.

Robert K. Corbin, Atty. Gen. by Jessica Gifford Funkhouser and Barbara Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

George A. Rouff, Yuma, for appellant.

OPINION

MOELLER, Justice.

JURISDICTION

Defendant Jimmy Lee Mathers, along with co-defendants Fred Lawrence Robinson and Theodore Washington, was convict-

ed of first degree murder, attempted first degree murder, two counts of aggravated assault, first degree burglary, and armed robbery. All three defendants received death sentences for the murder and terms of imprisonment for the remaining offenses. All three appeals were consolidated for oral argument. This opinion addresses only Mathers' appeal. The appeals of Robinson and Washington are the subject of a separate opinion of this court. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13-4031 and 13-4033.

## ISSUE PRESENTED

The following issue is dispositive of this case:

Whether the trial court erred in denying Mathers' Rule 20 motion for judgment of acquittal made at the close of the prosecution's case.

## FACTS

The nature of the question presented requires a fact-intensive analysis of all the evidence as it relates to Mathers, which follows later in this opinion. We set forth here an overview. Additional background facts are contained in the court's consolidated opinion concerning co-defendants Robinson and Washington. *See State v. Robinson,* 165 Ariz. 51, 796 P.2d 853 (1990).

Defendants Robinson, Washington and Mathers were friends living in Banning, California. All three were acquainted with Susan Hill (Susan), who was involved in a long, stormy relationship with Robinson.

Susan and Robinson separated in 1983. In February 1984, Robinson confronted Susan in Pacoima, California, where she lived with her sister. Susan returned with Robinson to Banning after he threatened to "dispose" of her in the desert. After a few months, Susan returned to Pacoima. Susan later moved from Pacoima to live with her sister in North Hollywood.

In June 1986, Robinson and two men unconnected with this case confronted Susan in North Hollywood. Susan returned to Banning with Robinson after the other two men had tied up her sister and her niece at gunpoint, and after Robinson told Susan that he had intended to kill her.

In November 1986, Susan again left Robinson in Banning to live in Philadelphia with an aunt and uncle. In January 1987, Robinson drove to Philadelphia from California with his two sons, Andre and Truman, his cousin Louis Charles and Mathers. Susan accompanied the group back to California. On the way, Robinson and Mathers quarreled and Robinson abandoned Mathers in Oklahoma.

In March 1987, Susan moved out again, this time to Yuma to live with her parents, the Hills, for a few weeks. In April, she returned to Pacoima to live with her grandmother but, after two days, moved to her sister's house in Pasadena.

On June 8, 1987, Robinson told his son Andre that he was going to Yuma to see if Susan was living there with her parents. Andre saw Robinson and Mathers put a duffle bag and some guns in Robinson's car. Andre stated that Mathers said "they was going to Arizona to take care of business." Robinson, Mathers and Washington were seen driving off together around 6:00 p.m.

Later that evening, LeSean Hill (Susan's brother) was watching television in his home in Yuma. A man who identified himself as "James" knocked at the door, stating that he owed LeSean's father money. When LeSean opened the door, the man forced his way into the Hills' home. LeSean escaped to a neighbor's house and called police.

Meanwhile, Ralph Hill, Sr. and his wife, Sterleen, left their bedroom to investigate the noises. Two armed men forced the Hills back into their bedroom, stating they were narcotics agents and demanding drugs and money. The Hills were forced to lie down on the floor. While lying on the floor, Ralph looked up and saw a black man with a mustache and red bandana go through his closet and drawers, but did not see the man who stood over him. A voice in the background said "we better get the

kid." The Hills were then tied up. Both were shot in the back; Mrs. Hill was killed and Ralph Hill was seriously injured. A cigarette lighter holder, a watch, and a locked box containing a gold watch and coins were stolen from the home.

After hearing of the shootings, members of the Hill family left California in two cars to go to Yuma. They stopped in Banning to pick up Robinson's boys. As the group was driving near Coachella, California, they saw Mathers, walking west, toward Banning. One of the Robinson boys informed the Hill family group that Mathers had been with Robinson in Banning the day before the shootings. Susan's brother, Ralph, Jr., who was in one of the cars, testified that one member of the Hill family pulled a gun on Mathers; however, this was denied by other family members. Mathers quickly fled on foot to a nearby supermarket. At some point during the confrontation, Mathers said he had been in Arizona and that Robinson was in Yuma. Later, police questioned Mathers concerning his possible involvement in the shootings and transported him to Yuma, where he was arrested.

After denial of his motion seeking severance, Mathers was tried and convicted along with Robinson and Washington. He was sentenced to death for the murder and terms of imprisonment for the remaining offenses.

## DISCUSSION

### A. The Standard of Review

Rule 20(a), Arizona Rules of Criminal Procedure, provides:

> **Before Verdict.** On motion of a defendant or on its own initiative, the court shall enter a judgment of acquittal of one or more offenses charged in an indictment, information or complaint after the evidence on either side is closed, if there is no substantial evidence to warrant a conviction. The court's decision on a defendant's motion shall not be reserved, but shall be made with all possible speed.

Defendant Mathers made a Rule 20 motion for acquittal at the close of the state's case and renewed it at the close of all the evidence.[1] He also made post-verdict motions, again raising the argument that the evidence was insufficient. All motions were denied.

Where there is a complete absence of probative facts to support a conviction, we will reverse a trial court's denial of a Rule 20 motion. *State v. Wiley,* 144 Ariz. 525, 539, 698 P.2d 1244, 1258 (1985), *overruled on other grounds, State v. Superior Ct.,* 157 Ariz. 541, 760 P.2d 541 (1988); *cf. Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). A motion for acquittal made at the close of the prosecution's case is tested on the sufficiency of the evidence at that point. *See State v. Neal,* 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984) (motion for judgment of acquittal is designed to test sufficiency of state's evidence). The principle that a defendant waives the motion by himself supplying the evidence missing in the state's case is not involved in this case because Mathers did not present any evidence. *See State v. Savoy,* 109 Ariz. 531, 532, 514 P.2d 452, 453 (1973); *State v. Hanshe,* 105 Ariz. 529, 530, 468 P.2d 382, 383 (1970); *State v. Adrian,* 24 Ariz.App. 344, 346, 538 P.2d 773, 775 (1975).

In analyzing the propriety of the jury's verdict, we must remain cognizant of the fundamental mandate of our criminal code:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to be acquitted.

A.R.S. § 13–115(A). This doctrine, universal in American law, requires the factfinder

---

1. None of the defendants testified. In their cases, Robinson and Washington each recalled one of the witnesses who had testified during the state's case.

to rationally apply the reasonable doubt standard to the facts in evidence. *Jackson*, 443 U.S. at 317, 99 S.Ct. at 2788, 61 L.Ed.2d at 572. The fact that a jury convicts a defendant does not in itself negate the validity of the earlier motion for acquittal. If it did, a jury finding of guilt would always cure the erroneous denial of an acquittal motion. This would render meaningless Rule 20 and the whole concept of judicial review of sufficiency of the evidence. The United States Supreme Court has noted, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt...." *Jackson*, 443 U.S. at 317, 99 S.Ct. at 2788, 61 L.Ed.2d at 572.

■ A judgment of acquittal is appropriate where there is "no substantial evidence to warrant a conviction." Rule 20, Ariz.R. Crim.Pro., 17 A.R.S.; *State v. Clabourne*, 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984). Substantial evidence is more than a mere scintilla and is such proof that "reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980); *see also State v. Edwards*, 136 Ariz. 177, 186, 665 P.2d 59, 68 (1983).

### B. The Evidence Relied Upon by the State

■ The state argues that the evidence is sufficient to support Mathers' convictions. Before discussing the state's argument and our analysis, we set forth in full that portion of the state's brief which contends that Mathers' convictions are sustainable:

In order to prove that appellant Mathers was guilty of first-degree murder, attempted first-degree murder, first-degree burglary, armed robbery, and two counts of aggravated assault, the state presented evidence that appellant Mathers, and codefendants Robinson and Washington left Banning, California, and drove to Yuma, Arizona, on the afternoon of June 8, 1987. Appellant Mathers told Andre Robinson before they left that they were going to Arizona to take care of some business. Obviously the "busi-

ness" appellant Mathers referred to required the use of weapons, as a shotgun, two pistols, and ammunition were loaded into the car.

Several months prior to the trip to Yuma, codefendant Robinson had driven Susan Hill, his common-law wife, from Banning to her parents' home in Yuma for a visit. Susan and codefendant Robinson had a stormy relationship and Susan was always leaving codefendant Robinson. When she left, she would stay with various relatives. Codefendant Robinson had made a number of trips to get Susan and bring her back to Banning. On one of those trips, appellant Mathers drove with codefendant Robinson to Philadelphia to get Susan. On another trip, codefendant Robinson went with two other men to [North Hollywood] to get Susan, who was staying at [her] sister's house. During that incident, the two men assaulted Susan's sister and niece with guns and tied them up. Codefendant Robinson was armed with a knife. He told Susan that he had intended to cut her throat and her sister's throat and leave them to die. Codefendant Robinson told Susan that the only thing that kept him from carrying out his plan was the presence of Susan's niece. Susan always returned to Banning with codefendant Robinson when he came to get her, not because she wanted to do so, but because she feared that codefendant Robinson would harm her relatives if she refused to return.

Without informing codefendant Robinson, Susan had left her parents' home in Yuma prior to June 8, 1987, and was living with her sister in Pasadena. Before the three men left Banning for the drive to Yuma, codefendant Robinson told his son Truman that they were going to Arizona to see if Susan was there.

In the late evening hours of June 8, 1987, two armed men forced their way into the residence of Ralph and Sterleen Hill (Susan's parents). The two men forced the Hills back into their bedroom, forced them to lay face down on the floor, and bound their hands and feet.

The men kept asking the Hills where the drugs and money were. Mr. Hill got a glimpse of one of the men, a young black man with a mustache, who was wearing a red bandana, as the man ransacked the closet and dresser drawers. (Codefendant Washington is a young black man with a mustache, and he was wearing a red bandana when he left Banning earlier that evening.) Mr. Hill did not see the other man, who was standing over them. One of the men shot Mr. and Mrs. Hill in the back with a shotgun, killing Mrs. Hill and seriously wounding Mr. Hill. The men took a watch, a silver lighter, and a box of coins from the bedroom and left.

The Hills' teenage son had reported the incident to the police, and codefendant Robinson was apprehended driving away from the Hills' residence. Codefendant Washington made his way to the bus station, and returned to Banning the next day. Appellant Mathers was arrested in Coachella the next day after being confronted by Susan and some of her relatives. Appellant Mathers told them that codefendant Robinson was in Yuma and admitted that he had also been in Arizona.

When the preceding evidence is viewed in the light most favorable to upholding the verdicts of the jury it is readily apparent that there was substantial evidence to warrant submitting the question of appellant Mathers' guilt or innocence on the charged offenses to the jury.

Brief for State at 21–23.

In only three instances in the quoted argument does the state refer to items of evidence which even relate to Mathers. We discuss each in turn. The first such assertion is:

> [T]he state presented evidence that appellant Mathers, and codefendants Robinson and Washington left Banning, California, and drove to Yuma, Arizona, on the afternoon of June 8, 1987. Appellant Mathers told Andre Robinson before they left that they were going to Arizona to take care of some business. Obviously the "business" appellant Mathers referred to required the use of weapons, as

a shotgun, two pistols, and ammunition were loaded into the car.

Brief for State at 21.

We agree the evidence would support a finding that Mathers said they were going to "Arizona [not Yuma] to take care of business," that Mathers was seen helping load a duffle bag and some guns into Robinson's car, and that Mathers was seen in the car apparently leaving Banning with Robinson and Washington. We find no evidence to support the state's assertion that "obviously" the "business" referred to required the use of weapons.

The second portion of the state's argument relating to Mathers is the assertion that: "On one of those trips, appellant Mathers drove with codefendant Robinson to Philadelphia to get Susan." Brief for State at 21. We have carefully examined the record concerning the Philadelphia trip. It shows that in January 1987, Mathers travelled to Philadelphia with Robinson, Robinson's cousin Louis Charles, and Robinson's children, Andre and Truman. Truman testified that they went to Philadelphia to look for his mother; Andre testified that Robinson told him they were going to Philadelphia to see his mother. There was no testimony whatsoever indicating Mathers' motive, intent or knowledge in accompanying Robinson to Philadelphia. In Philadelphia, Susan was lured to a train station by a call from her daughter Misha that she, Misha, was in trouble. There is no evidence Mathers knew of or participated in this deception. At the train station, Robinson, according to Susan, forced Susan into the car. The group drove to a motel for the night. The next day, the group took Susan to her aunt and uncle's house to gather some clothing. On the way back to California, Robinson and Mathers argued. Robinson left Mathers in Oklahoma. We fail to see how Robinson's abduction of Susan in Philadelphia can be used against Mathers, absent any evidence of Mathers' complicity in it.

The third and last reference to Mathers in the state's argument is: "Appellant Mathers was arrested in Coachella the next day after being confronted by Susan and

some of her relatives. Appellant Mathers told them that codefendant Robinson was in Yuma and admitted that he [Mathers] had also been in Arizona." Brief for State at 23.

This argument is partially supported by the record. Mathers was not arrested in Coachella but was, instead, arrested in Yuma after he agreed to accompany two officers there. Susan and two carloads of Hill family members and friends confronted Mathers near Coachella the day following the murder. After Mathers had been questioned by the group, he fled to a nearby store. The evidence is conflicting about whether one of the group pulled a gun on Mathers. There is evidence to support the state's assertion that Mathers "admitted" that he had been in Arizona, and stated that Robinson was in Yuma. At best, this evidence supports an inference that Mathers went to Yuma with Robinson and Washington, reached Yuma, was present in Yuma, and returned from Yuma to California. It does not, however, establish that Mathers went to the Hills' home, was at the Hills' home, was in the Hills' home, or participated in the murder and other crimes.

Upon reading the state's analysis of the evidence, one readily recognizes that most of the evidence argued has nothing to do with Mathers. Upon analyzing the few portions that do relate to Mathers, it is equally apparent to us that the evidence does not permit affirmance of Mathers' convictions. The three items that the state relies upon fail to marshal evidence sufficient to withstand Mathers' Rule 20 motion. However, because such a motion challenges the sufficiency of the entire record, we have independently reviewed the entire record to see whether the convictions are supported by evidence not specifically cited by the state.

C. Our Review of the Balance of the Record

We consider first the testimony of the surviving victim, Ralph Hill, and his son, LeSean. LeSean answered the door at his home on the fatal evening. LeSean never identified Mathers either at trial or in a voice line-up. LeSean testified that the man who knocked at the door identified himself as "James." Mathers' name is "Jimmy Lee," and his nickname is "J.B." In describing "James," LeSean, who is black, stated that "James" "looked black," and "sounded black." LeSean responded that the man at the door "could have been white" when asked: *"Is it possible ... that the man that was standing on the step before you ... because it was so black, ... that you were not able to determine whether he was white or black?"* (emphasis added). Despite this exchange, however, LeSean repeated his testimony that the man "looked black." LeSean also told police officers shortly after the shooting that the man at the door was black. Mathers is white, although a deputy sheriff testified that, in his opinion, Mathers "talked like a black person" and Susan Hill said Mathers talks "like he is trying to be black."

Ralph Hill, Sr., who survived the attack, never identified Mathers, at trial or in a voice line-up. We believe the only reasonable inference to be drawn from his testimony is that only *two* intruders were in the Hills' home.

Hill testified:

Q. Now, while this black man was going through the closet and dresser drawers was the other person screwing the gun in your ear, or did that happen at a different time?

A. It happened different times.

Q. With respect to one another, which happened first, if you know?

A. Well, the screwing in my ear happened first before I—I recognized anybody or seen anything as far as the dressers and the closet goes.

Q. Do you know what the other person was doing that you believed to be in the house as well?

A. I think he was standing over us while he was going through the dresser drawers.

Q. Then what happened as best you can remember?

A. The best I can remember after that was I heard a voice in the back-

ground say "we better get the kid," and they were talking about my son, LeSean. I don't know who said it, but somebody came in and said "we better get the kid." And then—.

Q. Let me interrupt you for one moment, Mr. Hill. When this was being said, did you know where the black man was that you saw?

A. I think he was still in front of me.

Q. And a voice that you heard?

A. Was someone else.

Q. Coming from behind you?

A. Yes, sir.

Hill stated that he was accosted by two men, one of whom he identified as a black man with a mustache and bandana. Washington, a black male with a mustache, was seen leaving Banning wearing a bandana. Barbara Bryant, Washington's girlfriend, testified that Washington called her in Banning, California from Yuma, early in the morning of June 9, 1987. Bryant stated that Washington told her he was stranded in Arizona. Detective Yoakum tracked the phone numbers listed on Bryant's bill and discovered that the calls originated from three different phone booths in Yuma. Robinson was apprehended driving from near the scene of the murder. Sergeant Brock testified that Robinson's shoes matched a print found outside the Hills' home. The only reasonable inference for the jury to draw from this evidence is that these two intruders were Robinson and Washington. Nothing in the record or any reasonable inference drawn therefrom places Mathers at or in the Hills' home.

Furthermore, additional evidence presented by the state does not establish Mathers' involvement in the crimes. A duffle bag belonging to Mathers was found in Robinson's car. The dissenters suggest that Mathers left his duffle bag in Robinson's car and lost contact with Robinson after the shootings because of Robinson's arrest. We find no evidence to support this speculation. A red bandana containing hairs *similar* to Mathers' hair was also found in the car. Even if the hair was in fact Mathers', this evidence is susceptible of many interpretations as to how and when his hair got on a bandana in his friend's car.

Richard Cahoe, a neighbor of the Hills, testified that LeSean Hill came to his house for help. Cahoe accompanied LeSean back to the Hills' residence. Stephanie Saden, who lived near the Hills, testified that she heard gunshots and a car driving away, but did not see any suspects.

After responding to a call to investigate the Hills' home, Deputy Koteles pursued a Chevette driven by Robinson from a point near the murder scene. Koteles found four .38 caliber cartridges in Robinson's pocket while patting him down. He also found an empty 12 gauge 00 buck shotgun shell box in Robinson's car. Deputy Helton transported Robinson to the station and secured his car. Later, Koteles arrested Robinson for first degree murder. He identified a bag of .38 caliber bullets that he found near the Hills' home on June 10, 1987.

On June 9, 1987 Koteles and Sergeant Brock travelled to Coachella. At their request, Mathers accompanied them back to Yuma, where Koteles arrested him.

David Padilla, firefighter, treated Mr. Hill at the scene. Dr. Barton Spitz, surgeon, performed surgery on Ralph Hill, Sr. Dr. Bruce Shirer, pathologist, testified about the autopsy he performed on Sterleen Hill.

Guy Hanna, who lived near the Hills, found two shotgun shells near the southeast corner of First and Figuroa Streets on June 9, 1987, and gave them to a deputy sheriff. Deputy Young testified to the finding of the two shotgun shells and to transporting Robinson's car to Phoenix. Deputy Merchant testified that he searched the area and took the two shotgun shells found by Guy Hanna into custody. Major Ogden also found two shotgun shells in the area where Hanna had located his two shells. Brock found Ralph Sr.'s watch and cigarette lighter case in a field near the Hills' home.

Major Ogden testified that he searched the crime area and found a shotgun near the northeast corner of First and Figuroa

Streets. Andre Robinson identified the shotgun as belonging to his father, defendant Robinson. Ken Kowalski, criminalist, testified that the shotgun found near the Hills' home had fired the two shells that struck the Hills. Sergeant Terry Ford of Banning, California testified that the shotgun in question had been reported stolen. A trenchcoat and pair of rubber gloves were also found in the area.

Margie Eddy, who lived near the Hills, found a loaded revolver cylinder in her newspaper box late in the afternoon on June 9, 1987, and Deputy Merchant took the cylinder and bullets found by Eddy into custody. Earlier, Major Ogden found a .38 caliber shell at the base of the newspaper box. Joe Dixon, who lived on Robinson's property, testified that Robinson owned a .38 caliber pistol.

Terry Hogan, criminalist, found no blood on the evidence he examined. Viola Sandate, records communication technician, lifted fingerprints from the scene, but made no comparisons between the lifted prints and Mathers' prints. Glenda Hardy, fingerprint examiner, identified only two fingerprints, both belonging to Robinson. One was in Robinson's car and one was on a doughnut box in the car. William Flynn, handwriting expert, testified that a high degree of probability existed that Robinson wrote a note found near the murder scene.

This, then, is the sum total of the evidence presented by the prosecution in its case-in-chief. While we agree that the evidence is ample to support the convictions of Robinson and Washington, *see State v. Robinson,* 165 Ariz. 51, 796 P.2d 853 (1990), we find it insufficient to support Mathers' convictions. Our exhaustive review of the evidence does not permit us to join in the dissenters' view that the evidence is sufficient to support Mathers' convictions. The dissent demonstrates to us mostly that ample evidence existed to convict Robinson, a fact with which we agree. In the final analysis, the validity of the dissent's analysis depends upon the unsupported assumption that three persons were in the Hill home and participated in the crimes. In our view, this assumption is supported not by proof, but by speculation. The trial judge who presided over the lengthy trial and personally heard all the evidence made no such assumption or finding and, indeed, expressed doubt that there were three intruders involved. At sentencing, the trial judge stated "at least two, and possibly three persons were in the Hill residence." Speculation concerning possibilities is an insufficient basis to sustain Mathers' convictions and order his execution.

## CONCLUSION AND DISPOSITION

In reviewing all the evidence as it applies to defendant Mathers, we are satisfied that it is insufficient to support the verdicts and sentences against him. Accordingly, the trial court erred in denying the motion for directed verdict made at the close of the state's case, renewed at the close of all the evidence, and again renewed post-verdict. Pursuant to A.R.S. § 13–4036, we set aside the convictions and sentences of defendant Mathers, and enter judgments of acquittal in accordance with his earlier motions.

FELDMAN, V.C.J., and CORCORAN, J., concur.

JOHN ROLL, Court of Appeals Judge, dissenting.

I respectfully dissent.

Jimmy Lee Mathers, along with Fred Lawrence Robinson and Theodore Washington, was convicted by a jury of first-degree murder, attempted first-degree murder, two counts of aggravated assault, first-degree burglary, and armed robbery. Mathers argues that insufficient evidence exists to uphold his convictions. Our standard of review is whether any rational trier of fact could find guilt beyond a reasonable doubt based upon the evidence presented. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576 (1979). In evaluating the evidence, we must view the evidence in the light most favorable to sustaining the verdicts, *State v. Arredondo,* 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987), including making all reasonable inferences which support the ver-

dicts. *State v. Girdler*, 138 Ariz. 482, 488, 675 P.2d 1301, 1307, *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 826 (1984). If substantial evidence exists to support the verdicts, they must be upheld. *State v. Moseley*, 119 Ariz. 393, 402, 581 P.2d 238, 247 (1979). Substantial evidence is evidence which is more than a scintilla of evidence. *State v. Clabourne*, 142 Ariz. 335, 345, 690 P.2d 54, 64 (1985).

Substantial evidence, that is, more than a scintilla of evidence, exists to support Mathers' convictions. I believe that it is critical that the evidence presented at trial be viewed as a whole rather than viewing each piece of evidence in isolation.

The evidence showed that Robinson was obsessed with his commonlaw wife, Susan. When Susan had separated from Robinson on earlier occasions, Robinson used ruses and/or heavy-handed tactics to regain her. On one occasion, when Robinson found Susan in Pacoima, California, he told her that if she did not return to Banning, California, with him, no one would ever find her body. On another occasion, he sent two armed men to a Hollywood residence where Susan was staying. That time, the two men held a child and one of Susan's sisters at bay while Robinson entered the home, found Susan hiding in a closet, and informed her that he had planned to have everyone in the house killed, but had changed his mind. In January 1987, Mathers accompanied Robinson on a trip from Banning to Philadelphia so that Robinson could once again compel Susan to return to Banning with Robinson. After Robinson successfully used a ruse to lure Susan to him, Susan agreed to accompany Robinson back to Banning. Susan warned her aunt and uncle that harm could come to them should they resist her returning to Banning with Robinson. In February 1987, Susan obtained Robinson's permission to go to Yuma, Arizona, to visit her father and stepmother for one week. Susan failed to return to Robinson. Robinson phoned her at the Hill home at least twice. During this time, Susan wrote to Robinson and warned him to stay away from the Hill's residence because her stepmother, Sterleen, had obtained a peace bond against him. Unbeknownst to Robinson, Susan

eventually left the Hill residence to live with a grandmother in Pacoima, then with a sister in Pasadena.

This, then, is the background for the events of June 8, 1987. That day, Mathers was at Robinson's house in Banning. Yuma is 175 miles from Banning. Robinson said he was leaving to look for Susan. Mathers said that he was going to Arizona to take care of business. Around the time this statement was made, Mathers helped load firearms and his dufflebag into Robinson's car. After the firearms were loaded into the vehicle, he left California in Robinson's car with Robinson and Washington about 6:00 p.m. That Mathers' Arizona business required the presence of firearms was a fair inference for the jury to draw. Just hours later, one of those firearms was used to kill Sterleen Hill and maim Ralph Hill at their Yuma, Arizona residence.

At about 11:45 p.m. that evening, LeSean, the Hills' teenage son, answered a knock at the door of their Yuma residence. A man identified himself as James. Whether Mathers would have used his real name was a question for the jury. LeSean vacillated in his testimony as to whether "James" was black or white. However, no lights were on outside the house, the night was dark, no street lights were in the vicinity, and only the television set illuminated the inside of the house. Obviously, visibility was limited. The jury and the trial judge saw and heard this witness and were in the best position to evaluate his testimony.

"James" forced his way into the house and was joined by a second man. The two intruders demanded drugs and money from Mr. and Mrs. Hill. Ultimately, the couple was forced to lay face down on the floor. One person stood over the couple while a second intruder, who wore a bandana on his head and had a moustache, rifled through drawers, apparently searching for the drugs and money the two men demanded. Ralph Hill heard the voice of someone who entered the room say, "We better get the kid." The evidence can be viewed as indicating the presence of three individuals: (1) the black man with the moustache and

wearing the bandana, who rifled through the dresser drawers; (2) the person who stood over the couple and who inferentially possessed the shotgun; and (3) the person whose voice was heard in the background. The number of intruders and their identities was a matter for the jury to resolve. Sterleen and Ralph were then shot in the back. Nothing of significant value was taken from the house. No evidence showed that Washington or Mathers knew that Susan's parents lived at that house; Robinson, however, had been to the house before. There is absolutely no evidence that Robinson believed Susan's parents would have drugs or money. There was evidence that Sterleen's warning to the violent and volatile Robinson had been communicated to Robinson and that Robinson believed Susan was still staying at that residence. The jury could reasonably have concluded that Robinson was not one of the two men who repeatedly demanded drugs and money from the elderly couple.

The jury could reasonably have inferred from the evidence that Robinson malevolently sent Mathers and Washington to the Hills' home after suggesting that the occupants thereof possessed drugs and money. The jury also could reasonably have concluded that Robinson's dispatch of the two intruders resulted from the couple's sheltering of Susan and from Sterleen's issuance of a warning toward Robinson. Viewed in any other light, this case lacks rhyme or reason, for Robinson knew well that the Hills had neither drugs nor money.

Shortly after the murder took place, Robinson was arrested driving near the Hill home and Robinson's footprint was found near the residence. Mathers' dufflebag was still in Robinson's car. From this fact, the jury could have reasonably concluded that Mathers had travelled to Yuma with Robinson and had not severed his contact with Robinson until Robinson fled the crime scene and was arrested. Ralph Hill told police that one of the assailants was a black man, with a moustache, who wore a

bandana. Washington had a moustache and wore a bandana on his head earlier in the day. Just hours after the murder, Washington placed phone calls from Yuma to his girlfriend. Later that day, Mathers was encountered walking toward Banning and away from Yuma. Mathers said that he was coming from Arizona and that Robinson was in Yuma. The jury could reasonably have concluded that Mathers knew Robinson had been in Yuma because Mathers himself had also been in Yuma and Mathers was walking because he, like Washington, lost his transportation when Robinson was arrested.

Although no one identified Mathers as being in the Hills' home the night of the murder, no eyewitness identification placed Robinson or Washington in the home either.[2]

Certainly, other inferences can be drawn from these various pieces of circumstantial evidence. It can be argued that each piece of evidence was nothing more than a random event having no connection with any other occurrence. Most certainly, this is what all three defense lawyers tried to tell the jury. However, on appeal, we are obligated to view the evidence in the light most favorable to upholding the verdicts, *Arredondo, supra,* and must make all reasonable inferences which support the verdict. *Girdler, supra.*

This court has previously recognized that conduct before and after an offense are circumstances from which one's participation in the criminal offense may be inferred. *State v. Villegas,* 101 Ariz. 465, 468, 420 P.2d 940, 943 (1966). *See also People v. Moore,* 120 Cal.App.2d 303, 260 P.2d 1011 (1953), *cert. denied,* 347 U.S. 978, 74 S.Ct. 791, 98 L.Ed. 1117 (1954). In *Villegas,* this court also emphasized the improbability that individuals planning a crime would bring along a nonparticipant, ignorant of their plans, who might later "decide that he would oppose their criminal

2. Ralph Hill was unable to identify Robinson or Washington in a photo lineup. This lineup was conducted shortly after he was severely injured and still hospitalized. Testimony indicated the possibility he had the incorrect glasses when he viewed the photo lineups. The jury properly weighed the credibility of this evidence.

**74**

action or later inform against them." *Villegas*, 101 Ariz. at 468, 420 P.2d at 943.

Substantial evidence against Mathers existed from which the jury could reasonably have concluded that he was one of the participants in the murder of Sterleen Hill and the attempted murder of Ralph Hill. I would affirm Mathers' convictions.

JACOBSON, J., concurs in the dissent.

Chief Justice Frank X. Gordon, Jr. and Justice James Duke Cameron recused themselves in this matter. Pursuant to Ariz. Const. art. 6, § 3, Judge Eino M. Jacobson, Court of Appeals, Division One, and John M. Roll, Court of Appeals, Division Two, were assigned to sit in their stead.