NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

RYAN MATTHEW LUNA, *Appellant.*

No. 1 CA-CR 17-0033
FILED 2-1-2018

---

Appeal from the Superior Court in Maricopa County
No.  CR2014-132511-001
The Honorable Richard L. Nothwehr, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

DeBrigida Law Offices, PLLC, Glendale
By Ronald M. DeBrigida, Jr.
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Jennifer M. Perkins joined.

---

**J O H N S E N**, Judge:

**¶1**  Ryan Matthew Luna argues insufficient evidence supported his convictions for trafficking in stolen property and theft. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**  In February 2014, Luna sold an industrial floor grinder and a vacuum unit to the owner of Flo-Tech, a concrete-floor finishing company. At the time, Luna was a foreman at QuestMark, a larger concrete-floor finishing company that is a competitor of Flo-Tech. A few months later, QuestMark discovered that one of its floor grinders and a paired vacuum unit were missing. QuestMark subsequently learned that Flo-Tech had acquired the missing items. QuestMark identified the two devices through the vacuum's serial number and a distinctive paint stain on the grinder.

**¶3**  QuestMark notified police, who arrested Luna. The State charged him with one count of second-degree trafficking in stolen property and one count of theft of property valued at $4,000 or more, both Class 3 felonies. After a four-day trial, the jury convicted Luna on both charges, and the court sentenced him to two concurrent prison sentences of 10.5 years.

**¶4**  Luna timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2018), 13-4031 (2018) and -4033(A)(1) (2018).[1]

---

[1]  Absent material revision after the relevant date, we cite a statute's current version.

## DISCUSSION

¶5        Luna argues the evidence was insufficient to support the convictions and the superior court therefore erred in denying his motion for acquittal at the close of the State's case.

### A.      Legal Principles.

¶6        Under Rule 20(a)(1) of the Arizona Rules of Criminal Procedure, a judgment of acquittal should be entered "if there is no substantial evidence to support a conviction." "We review a trial court's denial of a Rule 20 motion for an abuse of discretion and will reverse a conviction only if there is a complete absence of substantial evidence to support the charges." *State v. Tillmon*, 222 Ariz. 452, 456, ¶ 18 (App. 2009) (quotation omitted). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67 (1990) (quoting *State v. Jones*, 125 Ariz. 417, 419 (1980)). The substantial evidence supporting conviction may be circumstantial or direct, *State v. Mosley*, 119 Ariz. 393, 402 (1978), and the State need not negate every conceivable theory of innocence when circumstantial evidence alone supports the conviction, *State v. Blevins*, 128 Ariz. 64, 67 (App. 1981). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. West*, 226 Ariz. 559, 562, ¶ 16 (2011) (quoting *Mathers*, 165 Ariz. at 66 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))).

### B.      The Elements of the Charged Crimes.

¶7        Luna was convicted of second-degree trafficking in stolen property and theft of property valued at $4,000 or more. "A person who recklessly traffics in the property of another that has been stolen is guilty of trafficking in stolen property in the second degree." A.R.S. § 13-2307(A) (2018). Trafficking includes, among other things, "sell[ing] . . . stolen property to another person." A.R.S. § 13-2301(B)(3) (2018). "'Recklessly' means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." A.R.S. § 13-105(10)(c) (2018). For a defendant's conduct to be reckless, the defendant's disregard of a risk must be "a gross

deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*

¶8 "A person commits theft if, without lawful authority, the person knowingly . . . [c]ontrols property of another with the intent to deprive the other person of such property." A.R.S. § 13-1802(A)(1) (2018). "'Knowingly' means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists." § 13-105(10)(b).

**C. The Evidence.**

¶9 Four witnesses testified at trial: A former QuestMark manager, Flo-Tech's owner, the Flo-Tech employee who facilitated the purchase from Luna, and a Phoenix burglary detective.

¶10 The former QuestMark manager testified that in mid-2014, the company realized it was missing a half-ton industrial floor grinder it had purchased for approximately $18,000, along with a separate vacuum unit for which it had paid approximately $12,000. Upon investigation, QuestMark learned that Flo-Tech had the grinder. Although the plate with the grinder's serial number had been removed, the machine bore a distinctive paint stain from a past dye-sprayer incident. QuestMark identified the vacuum from the device's make and serial number.

¶11 According to the former manager, QuestMark could not determine which of its crews last used that particular grinder or exactly how long the grinder had been missing because it did not track the location of its equipment or keep records of what crews used which machines. He testified, however, that Luna, who worked as a QuestMark foreman for about three years until sometime after February 2014, had access to the equipment. As a foreman, Luna would transport a grinder and an associated vacuum to and from job sites, and was responsible for securing the equipment at job sites when projects lasted longer than a single day. The manager testified that neither Luna nor anyone else at QuestMark in Arizona had authority to dispose of or sell equipment. When QuestMark's Arizona operation retired equipment from use, company policy required local employees to call QuestMark's main office in Pennsylvania to arrange transport back to Pennsylvania.

¶12 Flo-Tech's owner testified that in 2014, he was in the market for a floor grinder and vacuum. One of his employees told him that a man, whom the owner came to know as Ryan Luna, had a grinder and vacuum

for sale.  Luna offered to sell the owner the grinder and vacuum set for around $8,000, which the owner testified was "a really good price" if the equipment was in good shape.  The owner arranged with Luna to rent the machines for a week for $1,200 or $1,500 to try them out to make sure they were in good working order.  The grinder worked well, so the owner met with Luna in person and gave him a check made out to "Ryan M. Luna" for an additional $6,500 to complete the transaction.  The owner testified Luna at first may have suggested payment in cash.

¶13          The Flo-Tech employee testified he had known Luna for several years, dating back to when they both had worked at QuestMark. He testified he told Luna that Flo-Tech was looking to purchase a grinder, and Luna told him that he "knew somebody" who had one for sale.  The Flo-Tech employee put Luna and Flo-Tech's owner in contact with each other.  Once Luna and the owner closed a deal for the equipment, the Flo-Tech employee went with Luna to pick up the equipment at a downtown Phoenix warehouse.  When they arrived, another man was there and unlocked the warehouse for them.  The Flo-Tech employee then loaded the grinder and vacuum onto a trailer and took it to Flo-Tech.

¶14          The Phoenix police detective testified that Flo-Tech's owner identified Luna in a photo lineup.  The detective stated he had no evidence that Luna physically took the equipment from QuestMark.  He also acknowledged that he had not taken any steps to identify where the equipment might have been before Flo-Tech bought it and had not identified anyone else who may have had the equipment or come into contact with it.

¶15          Finally, the State also offered in evidence QuestMark's invoice for its purchase of the equipment, information sheets on the equipment, photographs of the equipment, a photo of the interior of Flo-Tech's facility, and copies of the check Flo-Tech's owner wrote to Luna.

¶16          Viewed in the light most favorable to upholding the jurors' verdicts, there was substantial evidence establishing the elements of second-degree trafficking beyond a reasonable doubt.  A juror could infer that the equipment was stolen based on evidence that QuestMark owned it and no one at QuestMark in Arizona had authority to dispose of it, and yet it disappeared and later showed up in Luna's control.  That Luna sold the stolen machines was evidenced by the testimony of Flo-Tech's owner and its employee, both of whom identified Luna as the person who sold the equipment, along with the check made out to Luna.  Finally, the fact that Luna was aware of a significant risk that the equipment had been stolen

from QuestMark was established by evidence that (1) he worked at QuestMark and was familiar with the make and type of grinders the company used, (2) the stolen grinder was of a make and type that Luna's work crews at QuestMark had used, and (3) the stolen grinder bore the same paint stain as a machine that QuestMark owned and used and was missing its serial number plate. Luna's conduct was a gross deviation from what a reasonable person would do in like circumstances: Although a reasonable person likely would have notified his employer that he was aware of equipment that had likely been stolen from the company, or at least refrained from further involving himself with the stolen equipment, Luna instead sold the equipment to Flo-Tech.

¶17　　　　A rational juror also could have reasonably concluded that the State had proven the elements of theft beyond a reasonable doubt. As stated above, a reasonable juror could conclude that the equipment was QuestMark's and Luna knew it. A juror could reasonably infer that Luna controlled the equipment based on the fact that the other man at the warehouse unlocked and opened the doors and passively allowed Luna and the Flo-Tech employee to load the equipment and take it away. From the fact that Luna sold the machine, the inference that he intended to permanently deprive QuestMark of it is inescapable. And the evidence showed that Luna had no lawful authority to sell the equipment: No QuestMark foreman had authority to sell QuestMark equipment.

¶18　　　　Further, there was evidence that Luna had both the opportunity and the means to steal the equipment from QuestMark: As a foreman at the company, he had access to the equipment and a truck to transport it. He also would have known that QuestMark did not carefully track the whereabouts of its machines, so he would have known that if he took a machine, the company likely would not miss it right away. Additionally, Luna's willingness to sell the machines for a relatively low price, along with the Flo-Tech owner's testimony that Luna asked for cash for the equipment, imply Luna was aware the equipment was stolen and was eager to get rid of it quickly without leaving a record of the transaction. Finally, the fact that he suggested at first to the Flo-Tech employee that it was someone else who was selling the equipment, but then negotiated the sale himself and took a check in his own name, suggests that his original story was an attempt to distance himself from what he knew was an illegal transaction.

**CONCLUSION**

**¶19** Because substantial evidence supports the jury's verdicts, we affirm Luna's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED: AA