NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ARLANDIS WESLEY, *Appellant.*

No. 1 CA-CR 17-0792
FILED 1-31-2019

Appeal from the Superior Court in Maricopa County
No. CR2017-001601-002
The Honorable Michael W. Kemp, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

The Stavris Law Firm PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Jennifer B. Campbell joined.

---

**H O W E**, Judge:

¶1        Arlandis Wesley appeals his convictions and sentences for conspiracy, burglary, kidnapping, armed robbery, and misconduct involving weapons. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509 ¶ 93 (2013). In May 2014, D.D. and his friend, J.S., rented a home in Glendale, Arizona. D.D.'s girlfriend L.S. and their one-year-old son A.D. lived there also. J.S. moved his large gun safe into the home's garage. D.D. heard from a neighbor about a theft in the area and installed an alarm system and surveillance cameras.

¶3        On the night of May 6, L.S. went out to dinner and a movie with her sister, C.S., and C.S.'s daughter, M.S. D.D. went to sleep with A.D. in J.S.'s bedroom so that L.S., C.S., and M.S. could sleep in the master bedroom when they arrived home. L.S., C.S., and M.S. arrived home around 1:00 a.m. on May 7, and L.S. activated the alarm system before they went to sleep in the master bedroom.

¶4        Around 6:30 a.m., a red Toyota Camry parked in front of D.D.'s house, and Wesley, Arthur Meeds, and Antonio Yanez exited the car and walked toward the house. The three men met up with a fourth man armed with a gun, Eric Boozer, and they entered the home through an Arcadia door.

¶5        D.D. was awakened by a "burning" and "stinging" sensation to his head. He saw a person wearing "pantyhose" over his face and felt Meeds putting pressure on his back. In a "deep, raspy voice," Meeds told D.D., "Get up . . . I'm going to kill you. I want the money. I want the power. I got three of my partners in here with me. We're going to get it." At that point, D.D. "felt a gun put to the back of [his] head," and A.D. woke up crying. Knowing that the door to the garage was alarmed, D.D. told Meeds

that he had money in the garage and to follow him, intending to set off the alarm and alert the police.

¶6          As Meeds and Boozer walked D.D. down the hall, D.D. "saw a couple more people" in the master bedroom. He also noticed that the hallway closet had been "torn apart," items had been scattered "all over the place," and the entertainment system and television had been taken off the wall. Further, he noticed "a little hole" near the lock on a window. Around 6:40 a.m., D.D. opened the door to the garage and entered with Meeds pointing a gun at him. As soon as they entered the garage, the alarm activated and initially made a beeping sound. D.D. knew that if he did not deactivate the alarm within ten seconds that it would create a "crazy, ridiculous noise" and also contact the police. After the ten seconds passed, a "siren noise" came on. Meeds made D.D. turn the alarm off and then told D.D. to open the safe in the garage.

¶7          Although the safe belonged to J.S., D.D. had previously seen J.S. open it. He thought he knew the combination but was not able to open it. After D.D. failed to open the safe, Boozer said, "Maybe his son will help him open it. If not, we'll cut his fingers off." Meeds told Boozer to get A.D. and pointed the gun at D.D.'s head and said, "This is your last chance . . . If you don't open this [] safe, I'm going to blow your head off." Boozer then returned to the garage with A.D., and the men laid D.D. on the floor while Boozer tried to open the safe. Wesley entered the garage and informed Meeds that D.D. had a safe in his bedroom. As Meeds started to take D.D. to the bedroom, Wesley attempted to open the safe in the garage.

¶8          During this time, Yanez woke up L.S. and C.S. by stating, "Wake up. Wake up. We are the police." L.S. attempted to get up to retrieve A.D., but Yanez slammed her down on the bed and said, "If you get up, we will shoot you." L.S. and C.S.'s hands were zip-tied behind their backs and then laid face down on the bed. M.S. remained asleep during these acts.

¶9          After reaching the bedroom, Meeds told D.D. to open the safe in the closet. At this point, L.S. and C.S. saw that D.D. had "blood gushing on the side of his face." D.D. noticed that a wire was sticking out of the safe, and his attempts to open it were unsuccessful. Meeds then told D.D., "You better stop [mess]ing around and hurry up." During this exchange, Meeds had lifted his mask above his face, and D.D. saw his face. After further unsuccessful attempts to open the safe, Meeds took D.D. back to J.S.'s bedroom, laid him down on the bed, zip-tied his hands and feet, placed a mirror on top of D.D., and zip-tied D.D. to the mirror. Meeds told D.D., "You know if we don't find nothing in here . . . I'm going to kill you. I'm

going to kill you." Meeds also stated, "If we don't find nothing, we are going to take their I.D.'s and we are going to find and look for them and come back." Then one of the men took L.S.'s passport out of her purse. D.D. overheard the men talking about using his Cadillac Escalade in the driveway to take one of the safes.

¶10 Officer Joseph Pinda responded to the alarm call, and he arrived at the home around 7:00 a.m. He noticed D.D.'s Escalade parked in front of the house with the engine running, and he pulled up next to the driver-side window. The driver-side window lowered, and Officer Pinda saw a black male who appeared nervous. Officer Pinda asked the man what was going on, and the man replied, "I live here." Then Officer Pinda asked for the house's address, and the man replied, "[C]'mon man . . . I only lived here for a month." The man got out of the Escalade, left the car running, and returned to the house through the front door. At that point, Officer Pinda called for backup and waited.

¶11 D.D. heard Boozer inform his accomplices that the police were outside. D.D. then asked Meeds to let him go so that he could tell the police that everything was fine in the house. Meeds removed D.D.'s zip ties and attempted to clean the blood from D.D.'s head. Meeds placed a robe over D.D. and told him to tell the police that everything was fine in the house. Before D.D. went outside, the men noticed that D.D.'s feet were covered in blood. After cleaning D.D.'s feet, Meeds said, "If you don't want nothing to happen to your [] family, you better get out there, tell them everything's fine."

¶12 Around 7:10 a.m., D.D. went out the front door and walked toward Officer Pinda, who noticed that D.D.'s head was bleeding. D.D. told Officer Pinda that four men were in his home doing an "invasion." During this time, L.S. "heard silence," got out of the bed, looked down the hallway, and saw that the area was "clear." While C.S. remained in the master bedroom with A.D. and M.S., L.S. went into the next room and exited through the room's window with her hands still zip-tied.

¶13 After exiting, L.S. saw Wesley standing behind the gate on the west side of the house. Wesley saw L.S., turned back, looked over the gate, and then walked toward the Camry. Officer Pinda ordered Wesley to stop. Wesley turned to Officer Pinda and stated, "I don't know what's going on," got into the Camry, and drove off. L.S. followed Wesley out of the gate and told Officer Pinda to stop Wesley because he was one of the home invaders. Officer Pinda informed other officers to pursue the Camry, and they did so.

A SWAT team arrived and entered the house, saw no other suspects, and brought out C.S., A.D., and M.S.

¶14 Police officers pursued Wesley, who drove recklessly through stop signs and red lights. He also drove directly at an officer before driving on the sidewalk to get around the officer. The officers lost track of Wesley. Around this time, officers had caught Meeds and Yanez who had fled on foot, but neither person was armed when arrested. Meeds had two of D.D.'s watches in his possession, and L.S.'s passport was found near a dumpster that Meeds had passed while fleeing.

¶15 A few hours later, a homeowner along Wesley's escape route found a gun in his front yard and called the police. Officers retrieved the gun, which had blood on it. The gun was loaded, had a bullet in the chamber, and the hammer was cocked. A detective learned that Wesley was the registered owner of the red Toyota Camry. One of D.D.'s neighbors had previously seen that car, or a similar car, driving around the neighborhood and thought that the previous car's occupants were "casing" D.D.'s house. The police located and arrested Wesley twelve days after the home invasion.

¶16 In March 2017, the State indicted Wesley and Meeds, his co-defendant, with (1) one count of conspiracy to commit armed robbery, aggravated assault, first-degree burglary, kidnapping, misconduct involving weapons, and assisting a criminal street gang, a class 2 felony; (2) one count of first-degree burglary, a class 2 felony; (3) three counts of kidnapping, class 2 dangerous felonies; (4) two counts of kidnapping, class 2 dangerous felonies and dangerous crimes against children ("DCAC"); (5) three counts of armed robbery, class 2 dangerous felonies; (6) one count of misconduct involving weapons, a class 4 dangerous felony; (7) one count of assisting a criminal street gang, a class 3 felony; and (8) one count of unlawful flight from a law enforcement vehicle, a class 5 felony. Before trial, the trial court dismissed the assisting a criminal street gang charge. The State then submitted an amended indictment that deleted the street gang charge and agreed that the misconduct involving weapons charge should be severed from the other counts.

¶17 Wesley and Meeds were tried by a jury, and after the State presented its evidence and rested, Wesley moved for judgment of acquittal, which the trial court denied. The jury subsequently convicted Wesley and Meeds of conspiracy to commit first-degree burglary; first-degree burglary; aggravated assault; kidnapping D.D.; kidnapping L.S.; kidnapping C.S.; kidnapping A.D., who they found was under 15 years old; armed robbery

of D.D.; armed robbery of L.S.; and attempted armed robbery of C.S. They were found not guilty for kidnapping M.S. Wesley was also found guilty for unlawful flight from a law enforcement vehicle. Thereafter, the court addressed Meeds and Wesley's misconduct involving weapons charges. The State provided evidence that Meeds and Wesley were convicted felons, and that nothing showed that their possession rights had been restored. The jury found both men guilty of misconduct involving weapons. The jury also found numerous aggravating circumstances for both men.

¶18         The court sentenced Wesley to concurrent terms of 15.75 years' imprisonment each for his convictions for conspiracy to commit first-degree burglary; first-degree burglary; kidnappings of L.S., C.S., and D.D.; and armed robberies of D.D. and L.S. The court also sentenced him to concurrent terms of 11.25 years' imprisonment for his conviction for attempted armed robbery of C.S. and 10 years' imprisonment for his conviction for misconduct involving weapons. The court sentenced him to a consecutive term of 13 years' imprisonment for his conviction for kidnapping A.D. and a consecutive term of 4 years' imprisonment for his conviction for unlawfully fleeing from a law enforcement vehicle.

## DISCUSSION

¶19         Wesley agrees that the State presented sufficient evidence to convict him of unlawful flight from a law enforcement vehicle, but nevertheless maintains that the State did not present sufficient evidence on the remaining charges to withstand his motion for judgment of acquittal under Arizona Rule of Criminal Procedure 20. We review de novo a trial court's ruling on a Rule 20 motion. *State v. West*, 226 Ariz. 559, 562 ¶ 15 (2011). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at ¶ 16 (quoting *State v. Mathers*, 165 Ariz. 64, 66 (1990)). Sufficient evidence upon which a reasonable jury can convict may be direct or circumstantial. *Id.* A judgment of acquittal is appropriate only when "there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). In reviewing the sufficiency of the evidence, we neither reweigh conflicting evidence nor assess the credibility of witnesses. *State v. Buccheri-Bianca*, 233 Ariz. 324, 334 ¶ 38 (App. 2013).

¶20         "A person may be guilty of an offense committed by such person's own conduct or by the conduct of another for which such person is criminally accountable[.]" A.R.S. § 13–302. A person is criminally accountable for the conduct of another person if he is "an accomplice of

6

such other person in the commission of an offense including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice." A.R.S. § 13–303(A)(3). Under A.R.S. § 13–301(2), an "accomplice" is a person who, with the intent to promote or facilitate the commission of an offense, "[a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense."

### 1. Conspiracy to Commit First-Degree Burglary

**¶21**       Under A.R.S. § 13–1003(A), a person commits conspiracy by agreeing with another person that somebody would commit an offense, the person intended to promote or aid the commission of the offense, and one of the parties commits an overt act in furtherance of the offense. "Criminal conspiracy need not be, and usually cannot be, proved by direct evidence. The common scheme or plan may be inferred from circumstantial evidence." *State v. Fischer*, 219 Ariz. 408, 420 ¶ 46 (App. 2008) (quoting *State v. Arredondo*, 155 Ariz. 314, 317 (1987)). Here, the evidence showed that Wesley parked in front of the house in his Camry with Meeds and Yanez. The three men then met Boozer and entered through the home's Arcadia door, with Boozer holding a gun. As such, a jury could reasonably find that Wesley conspired to commit first-degree burglary.

### 2. First-Degree Burglary

**¶22**       A person commits first-degree burglary if such person or an accomplice enters and remains unlawfully in or on a residence with the intent to commit any theft or felony therein, and such person or accomplice knowingly possessed a deadly weapon or a dangerous instrument in the course of committing any theft or any felony. A.R.S. §§ 13–1507, –1508. The evidence showed that Wesley and the other intruders unlawfully entered and remained in D.D.'s home. They also attempted to open multiple safes and eventually left the house with D.D.'s watches and L.S.'s passport. The evidence also showed that at least one gun was used during the burglary and subsequent robberies. Thus, sufficient evidence exists from which a jury could reasonably find that Wesley committed first-degree burglary.

### 3. Completed and Attempted Armed Robberies

**¶23**       Under A.R.S. § 13–1902, a person commits robbery if such person takes property of another from that person's immediate presence and against that person's will, and such person threatens or uses force against the person with the intent to force surrender of the property or to prevent resistance to taking or keeping the property. A person commits

armed robbery if such person commits robbery while armed with a deadly weapon or a simulated deadly weapon. A.R.S. § 13–1904. Wesley and the other intruders were armed with at least one gun when they zip-tied L.S. and D.D., and circumstantial evidence showed that they had injured D.D.'s head. The men also took L.S.'s passport and D.D.'s watches against the victims' permission. Thus, a jury reasonably could find that Wesley committed armed robbery related to L.S. and D.D.

¶24        A person commits attempted armed robbery if the person takes "any step in a course of conduct planned to culminate" in the commission of armed robbery. A.R.S. § 13–1001(A)(2). Wesley and the other intruders were armed when they zip-tied C.S., but they were unsuccessful in finding or taking any property from her. As such, a jury reasonably could find that Wesley attempted to commit armed robbery of C.S.

### 4. Kidnappings

¶25        A person commits kidnapping by knowingly restraining another person with the intent to aid in the commission of a felony or place the victim or a third person in reasonable apprehension of imminent physical injury to the victim or the third person. A.R.S. § 13–1304(A)(3), (4). A person commits a DCAC kidnapping when such person kidnaps a child under 15 years old and such person's conduct or an accomplice's conduct was focused on, directed against, aimed at, or targeted the child. A.R.S. § 13–705(D). Here, D.D. was restrained when the intruders zip-tied his limbs, zip-tied him to a mirror, and forced him to stay on a bed while they took items from the home, such as D.D.'s watches. L.S. and C.S. were zip-tied and forced to stay on a bed while Wesley and the other intruders attempted to take items from the home and safes. A.D. was under 15 years old, had been moved against his or his parents' wishes, and had received a threat that his fingers would be cut off if D.D. did not open a safe. Therefore, a jury reasonably could find that Wesley had kidnapped D.D., L.S., C.S., and A.D., with A.D.'s kidnapping constituting a DCAC.

### 5. Misconduct Involving Weapons

¶26        A person commits misconduct involving weapons by knowingly possessing a deadly weapon while such person is a prohibited possessor. A.R.S. § 13–3102(A)(4). Under A.R.S. § 13–3101(A)(7)(b), a "prohibited possessor" means any person that has been convicted of a felony and whose civil right to possess or carry a gun has not been restored. "Possession" of a gun may be actual or constructive. *State v. Gonsalves*, 231 Ariz. 521, 523 ¶ 9 (App. 2013). A person "who exercises dominion or control

over property has constructive possession of it even if it is not in his physical possession." *Id.* (quoting *State v. Chabolla-Hinojosa*, 192 Ariz. 360, 363 ¶ 13 (App. 1998)). Therefore, "two or more persons may jointly possess a prohibited object; possession need not be 'exclusive, immediate and personal.'" *Id.* (quoting *State v. Carroll*, 111 Ariz. 216, 218 (1974)). If a person knows that his accomplice possesses a gun and the gun is essential to committing the offense, then the person is deemed to have jointly possessed the gun. *Id.* at 524 ¶ 13, 525 ¶ 19.

¶27        The evidence showed that Wesley and the other intruders entered the home with the intent to commit armed robbery and that at least Boozer carried a gun at the time. The evidence also showed that Meeds pointed a gun at D.D. multiple times. The evidence further showed that Wesley was a convicted felon, and no evidence showed that his civil right to possess a gun had been restored. As such, a jury could reasonably find that Wesley had committed misconduct involving a weapon.

## CONCLUSION

¶28        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA