865 P.2d 792

**STATE of Arizona, Appellee,**

v.

**Roger Mark SCOTT, Appellant.**

No. CR–91–0124–AP.

Supreme Court of Arizona,
En·Banc.

Dec. 21, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section and Randall M. Howe, Asst. Atty. Gen., Phoenix, for appellee.

John W. Rood, III, Phoenix, for appellee.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

A jury found Roger Mark Scott (defendant) guilty of first degree murder, conspiracy to commit first degree murder, and kidnapping, a dangerous crime against children. Defendant was sentenced to death on the murder count and to terms of imprisonment on the other counts. Appeal to this court is automatic on the death sentence, see Ariz. R.Crim.P. 31.2(b), and defendant appealed the other convictions and sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, 13–4033, 13–4035. Scott's co-defendants, Debra Milke and James Styers, were convicted in separate trials and have also appealed. The three cases were consolidated for oral argument, but we resolve them by separate opinion.

### FACTS

Because defendant challenges both the sufficiency of the evidence and the voluntariness

of his statements to police, we set forth the facts in detail. Co-defendant Milke and her four-year-old son, Christopher, shared an apartment with co-defendant Styers and his two-year-old daughter. While Milke worked at an insurance agency, Styers, who was unemployed, watched the children. Defendant and Styers have been friends for over 20 years. At the time of the murder, defendant was 41 years old, unemployed, and living with his mother. He did odd jobs for spending money and took care of his elderly and ill mother.

About a week before the murder, Styers told defendant that he and Milke planned to kill Christopher, and Styers asked defendant if he would help. Milke told defendant twice in the week before the murder that she wanted her son killed. She said that she had to get away from the child, that she wasn't cut out to be a mother, and that she wanted Styers and defendant to take care of it. Milke had a $5000 life insurance policy on her son as part of her employee benefits package. Styers and Milke offered to pay defendant $250 from the insurance proceeds if he would drive the car. Defendant told police that he and Styers had attempted to kill Christopher at least once in the week before the murder.

On the day of the murder, around 11:00 a.m., Saturday, December 2, 1989, Styers, who had Christopher with him, picked up defendant at defendant's residence. Christopher wanted to see Santa Claus and Styers told Christopher that they were going to Metrocenter to see Santa. The three stopped at two drugstores so defendant could pick up a prescription and a Christmas gift; they also had lunch. Styers began driving out to the desert, and then pulled over so defendant could take over driving. Styers told defendant where to stop; the two men and Christopher got out of the car. Christopher was told they were going to look for snakes. The three walked into the wash about 50 feet. At some point, Styers told defendant that he was going to leave the body close to the road so it would be found in a few days. Styers told defendant to get in the car and drive north a little ways, turn

around, and meet him on the road south of the wash.

Defendant drove north, turned around, and came back to the wash. Hearing nothing, he kept driving because there was traffic behind him. After making several passes by the wash, defendant pulled over and got out of the car. He did not see anybody, nor did he hear anything. He told police he thought Styers had decided not to go through with the plan, but then he heard three shots. Defendant got in the car, and then Styers came out to the road and got in the car. Styers said something to the effect of "that's done, get out of here." As defendant drove east on Union Hills, Styers tossed the shells from the gun out the window between 99th and 83rd Avenues.

Defendant drove to Metrocenter, a shopping mall, and parked outside of the Sears store. Styers had placed the gun in the glove compartment and told defendant to retrieve it later. The two men went into Metrocenter and, as planned, separated to make it look like they had not come together. Styers then told mall security that he had come to Metrocenter with Christopher to see Santa Claus and had stopped in Sears to use the restroom. Styers told security that while he was in the bathroom stall, Christopher disappeared. Metrocenter security searched unsuccessfully, and then called the police.

About 3:20 p.m. that afternoon, Styers and a Sears employee who had been helping him look for Christopher approached defendant in Metrocenter, and Styers asked defendant if he had seen Christopher. Defendant said he had not, and told Styers that he came to Metrocenter with an old friend from high school named Phil. Defendant later told police that this statement was made to distance themselves from each other and make it look like they had not come together.

Styers and defendant then walked to the parking lot. In the parking lot Styers gave defendant the gun and a pair of black Nike tennis shoes. The shoes were worn by Styers in the wash, and he wanted defendant to throw them in the dumpster and take the gun. Defendant threw the shoes in a planter in the parking lot, got on a bus around 4:20, and went home. The gun was later found in

his closet in a box—exactly where defendant told police it would be.

In the meantime, Styers remained at Metrocenter with the police. Not until about 12:30 a.m. on Sunday did Styers mention to police that he had been with his friend, the defendant, earlier that day. Styers told police that they had gone to some drugstores, ate pizza, and then he and Christopher had dropped defendant off near defendant's residence. Styers said he also saw defendant later at Metrocenter, but that defendant told him he came with someone named Phil.

At that point, the police and Styers went to defendant's home. Defendant told the officer the same story; that Styers had dropped him off and he had walked to a Circle K where he ran into Phil, an old acquaintance from high school. Phil wanted to buy some tools, so they went to Metrocenter. At Metrocenter, defendant and Phil became separated. While he was looking for Phil, defendant ran into Styers and the Sears employee. Defendant said that was the first he had heard that Christopher was missing. The police came back to defendant's home a few hours later, and asked him to come down to the station to give a more detailed statement. Defendant voluntarily went to the station.

At the station, he gave a statement to Officer Jones. In this statement he gave the story we have just recited. Several hours later, Detective Mills interviewed defendant who continued to relate the same story. At about 12:45 p.m. on Sunday, December 3, Detective Saldate began interviewing defendant. Saldate told defendant he didn't believe the Phil story and read defendant his *Miranda* rights.[1] A few hours later, defendant told Saldate that the Phil story was a lie. Eventually, he admitted that he knew where Christopher's body was. That evening, defendant led police to the body, showed them where Styers threw the shells, and where he had left the tennis shoes. Defendant gave Detective Mills a detailed tape-recorded statement at 8:00 p.m. that night. Defendant, Styers, and Milke were arrested for the murder of Christopher.

## ISSUES

1. Whether defendant's statements to the police on December 3, 1989 were voluntary.

2. Whether the trial court violated defendant's constitutional rights by its voir dire of the jury panel regarding the death penalty.

3. Whether the trial court erred by denying defendant's motion for judgment of acquittal of felony murder.

4. Whether the trial court erred by failing to give separate jury verdict forms for felony murder and premeditated murder.

5. Whether the trial court erred by failing to instruct the jury on facilitation as a lesser included offense of first degree murder.

6. Whether the trial court erred by not granting defendant's motion to dismiss the aggravation/mitigation hearing and to impose a sentence other than death.

7. Whether Arizona's death penalty statute is unconstitutional because:

 a. the jury does not determine the existence of aggravating factors; or

 b. the statute fails to adequately channel the sentencer's discretion; or

 c. death by lethal gas constitutes cruel and unusual punishment.

8. Whether the death penalty was properly imposed in this case. Specifically:

 a. Whether there was compliance with the *Enmund/Tison* standard of death eligibility.

 b. Whether the state established beyond a reasonable doubt that the murder was committed in expectation of pecuniary gain.

 c. Whether the murder was committed in an especially heinous and depraved manner.

 d. Whether the trial court improperly weighed the victim's age twice in balancing aggravating and mitigating factors.

 e. Whether the trial court properly considered the nonstatutory mitigating evidence proffered by defendant.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## DISCUSSION

### 1. Voluntariness of Statements to Police

 Defendant challenges the voluntariness of his statements to Detectives Saldate and Mills. Following a voluntariness hearing, the trial court found the statements were voluntary. Furthermore, it found no violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant contends that he was in custody prior to the time he was read his *Miranda* rights, and the confession made after the *Miranda* warnings was the result of improper and coercive police conduct consisting of the deprivation of food, sleep, and medication and Detective Saldate's statement that the police would be sent to question defendant's mother. The state argues that he was not in custody until he made incriminating statements to Saldate; therefore, he was never deprived of any items because he was always free to obtain the items himself. Furthermore, the state argues any claimed deprivation of sleep, food, or medication did not affect the voluntariness of the statements, and Saldate's statement that he would send police to speak with defendant's mother was not improper, nor did it induce the confession.

Because the only statements challenged were made after defendant was given his *Miranda* warnings, we focus only upon the separate voluntariness issue. *See State v. Stanley,* 167 Ariz. 519, 523, 809 P.2d 944, 948, *cert. denied,* — U.S. ——, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991) (*Miranda* and voluntariness are two separate issues); *State v. Tapia,* 159 Ariz. 284, 286, 767 P.2d 5, 7 (1988) (same).

 Confessions are presumed to be involuntary, and the state has the burden of proving by a preponderance of the evidence that the confession was voluntary. *State v. Amaya–Ruiz,* 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). Absent clear and manifest error, the trial court's ruling will not be disturbed on appeal. *State v. Rivera,* 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987). In reviewing the trial court's ruling, we consider the totality of the circumstances. *Stanley,* 167 Ariz. at 524, 809 P.2d at 949. In determining whether the confession was voluntary, the critical inquiry "is whether police conduct constituted overreaching." *Id. See also Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). The "police misconduct [must be] causally related to the confession." *Stanley,* 167 Ariz. at 524, 809 P.2d at 949 (citing *Colorado v. Connelly,* 479 U.S. at 164, 107 S.Ct. at 520).

When police officers arrived at defendant's residence at 2:15 a.m., defendant voluntarily agreed to accompany them to the police station. He was transported in an unmarked and uncaged police car, and was not handcuffed. The officer who took defendant's first statement at the station, in which he related the "Phil" story, testified that, at that point, defendant was free to leave and was not considered a suspect. The police, however, did not tell defendant that he was not under arrest. *Cf. Stanley,* 167 Ariz. at 523, 809 P.2d at 948 (defendant expressly told that he was not under arrest). At 4:18 a.m. defendant gave a taped statement in which he again told the "Phil" story. At 11:00 a.m., after defendant had been with the police for several hours, Detective Mills interviewed him. Mills testified that defendant did not appear "overly tired," and that he was alert and aware of the situation. Mills was aware that defendant was taking prescription medication; however, defendant never requested any medication.

Nothing suggests that any lack of medication had an adverse effect on defendant. In fact, the taped statement indicates that defendant received his medication that afternoon, though Detective Mills did not remember him taking it. Throughout the investigation, defendant was provided with soft drinks and cigarettes upon request; thus, it is reasonable to assume that had defendant asked to sleep, eat, or take his medication, the police would have responded similarly and provided these things. Detective Mills bought both himself and defendant dinner

before defendant made the taped confession. Indeed, in his taped confession, defendant stated that the police had "[b]een pretty nice" to him. There is no indication that the police should have known, in the absence of a request, that defendant was in need of anything. Despite the fact that defendant had been at the police station for nearly 14 hours before he made any incriminating statements, there is no evidence to suggest overreaching or misconduct by the police. *See State v. Linden*, 136 Ariz. 129, 134, 664 P.2d 673, 678 (App.1983) (length of time is but one factor to be considered).

The trial court obviously found that Saldate's statement did not coerce defendant's confession. The record reflects no improper motivation. Saldate took over the interview at 12:50 p.m. At 3:35 p.m. defendant confessed to Saldate. During that time, Saldate and defendant discussed several subjects, including the fact that defendant lived with and cared for his elderly mother. Defendant admitted that he made up the "Phil" story, the story that he was at Metrocenter with Styers and Christopher, and the story that Christopher disappeared at the mall. Saldate told defendant he thought defendant knew something about the disappearance and he wanted the truth. Defendant claims he confessed only after Saldate threatened to send police to his mother's house because he felt that would be too much for his elderly mother to handle.

The trial court was justified in finding that Saldate used no improper influence. Saldate did nothing improper when he suggested that police would be sent to defendant's residence to talk to his mother. Relevant factors in determining whether comments about a suspect's relatives constitute overreaching include "whether a defendant has agreed to answer questions following *Miranda* warnings, ... whether the defendant rather than police initiate the discussion concerning the relative, ... and whether the authorities are honest with the accused." *State v. Ferguson*, 119 Ariz. 55, 60, 579 P.2d 559, 564 (1978). Defendant waived his *Miranda* rights and answered questions for two hours before Saldate mentioned sending police to speak to defendant's mother. Saldate was being honest with defendant when he said that police would verify his story by questioning his mother. Furthermore, there was no promise that police would not speak to defendant's mother if he confessed.

We cannot say that defendant's statements were the result of anything but his own compulsion to tell the truth. *See Amaya–Ruiz*, 166 Ariz. at 166, 800 P.2d at 1274. We also affirm the trial court's finding that defendant voluntarily and knowingly waived his *Miranda* rights when read by Saldate, and later by Mills. Police did not threaten or intimidate defendant into waiving his rights. In fact, he had been volunteering the "Phil" story for several hours and continued with the story for two hours after he was given his *Miranda* warnings. There is also no evidence that defendant exhibited "objective signs of distress, confusion, or incomprehension," before he was read his *Miranda* rights. *See Tapia*, 159 Ariz. at 289, 767 P.2d at 10. Defendant answered questions freely and did not ask for an attorney or attempt to terminate the interview. *See Rivera*, 152 Ariz. at 513, 733 P.2d at 1096. The trial court's finding of voluntariness is fully supported by the record.

## 2. Voir Dire of Jury Panel Regarding Death Penalty

■ Defendant contends that asking prospective jurors about their views on the death penalty violated his constitutional rights to due process of law and to a fair and impartial jury. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); United States Const., Sixth and Fourteenth Amendments; Ariz. Const. art. 2, §§ 4, 24. Defendant also contends that questions regarding the death penalty constitute a religious test in violation of article 2, section 12 of the Arizona Constitution. Defendant contends the trial court violated the state constitution by asking the questions and by excusing venireman "S." for expressing a personal view against the death penalty.

Questioning potential jurors regarding their views on the death penalty to determine whether they have a bias regarding the death penalty that would prevent them from per-

forming their duties is a practice that has been repeatedly upheld by this court. *See, e.g., State v. Schaaf,* 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991); *State v. White,* 168 Ariz. 500, 509, 815 P.2d 869, 878 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992); *State v. Martinez–Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678, *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). The trial court properly asked questions that related to the jurors' ability to be fair and impartial.

■ Article 2, section 12 of the Arizona Constitution provides that no venireman shall be judged incompetent based on "his opinion on matters of religion." In *State v. Fisher,* 141 Ariz. 227, 249, 686 P.2d 750, 772, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984), we held that article 2, section 12 "does not say an individual will be qualified as a juror *despite* his religious beliefs if those beliefs prevent him from being fair and impartial in a given case." If a person's religious beliefs impinge upon his or her ability to be fair and impartial, then that person may be disqualified.

S. was opposed to the death penalty for "personal reasons." Nothing in the record indicates that these reasons were necessarily based on religion. S. was very forthright in answering the judge's questions and admitted that she would not be able to decide a case involving a potential death sentence fairly and impartially. Thus, we find no error.

### 3. Motion for Judgment of Acquittal of Felony Murder

■ Defendant contends that the trial court erroneously denied his motion for directed verdict on felony murder. The thrust of his argument is that there was insufficient evidence of kidnapping to support the predicate felony for felony murder. Specifically, defendant argues that there is no substantial evidence that he restrained Christopher with the intent to kill. "A motion for acquittal made at the close of the prosecution's case is tested on the sufficiency of the evidence at that point." *State v. Mathers,* 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990). We will affirm the trial court's denial of a motion for acquittal if there is substantial evidence to support the guilty verdict. *State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *Mathers,* 165 Ariz. at 67, 796 P.2d at 869, (quoting *State v. Jones,* 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)). Upon review, we consider the evidence "in the light most favorable to sustaining the verdict." *State v. Arredondo,* 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987).

■ Defendant was charged with felony murder based on the predicate offense of kidnapping. Therefore, the state was required to prove that defendant or another person caused the death of Christopher Milke "in the course of and in furtherance of . . . or immediate flight" from committing or attempting to commit kidnapping. A.R.S. § 13–1105(A). To prove kidnapping, the state had to prove that defendant knowingly restricted the child's movements with the intent to kill or physically injure the child. *See* A.R.S. § 13–1304(A). The jury was also instructed that the restriction must be accomplished "by intimidation *or* deception; *and* . . . in a manner which interfered substantially with the child's movements; *and* by moving the child from place to place." [2]

---

**2.** Section 13–1301(2) defines "restrain" as:

restrict[ing] a person's movements without consent, without legal authority, and in a manner which interferes substantially with such person's liberty, by either moving such person from one place to another or by confining such person. Restraint is without consent if accomplished by:
(a) [1] [p]hysical force, [2] intimidation or [3] deception; or (b) [4] [a]ny means including acquiescence of the victim if the victim is a child . . . and the victim's lawful custodian has not acquiesced in the movement or confinement.

Thus, there are four ways in which to establish lack of consent. In presenting its case to the jury, the state chose to limit itself to only two: intimidation and deception.

In its brief, the state argues that restraint was also shown by the fourth option: that there was acquiescence by Christopher, and that Debra Milke could not, by law, acquiesce in the taking of Christopher for the purpose of killing him. *See State v. Viramontes,* 163 Ariz. 334, 337, 788

Styers took Christopher from his apartment to defendant's place; then he and defendant took Christopher from the drug store and pizza place to the desert where he was killed. This constituted moving the victim from place to place. This was done by deception and in such a manner as to interfere substantially with Christopher's liberty. Styers persuaded Christopher to come with him by telling him that he was going to Metrocenter to see Santa Claus. He was led into the wash after being told that they were going to look for snakes, and he was even given binoculars to divert his attention. Naturally, as a four-year-old child, Christopher had no control over where he went or what happened and was totally dependent upon Styers and defendant who controlled the car.

Defendant admitted that Styers and Milke had asked him to help them carry out their plan to kill Christopher. He told police that he knew why they were driving out to the desert that day. In fact, defendant and Styers had previously attempted to carry out the plan. Defendant did all this with the intent to kill or physically injure Christopher. Defendant knew Styers had the gun with him, and he knew Styers was going to kill Christopher in the wash.

Defendant was charged and the jury was instructed on accomplice liability theory, which makes no distinction between principals and accomplices. *See* A.R.S. § 13–301. There is substantial evidence upon which the jury could find defendant guilty as an accomplice. Defendant did nothing to stop Styers, despite his knowledge that Styers intended to kill Christopher in the wash that day. The evidence established clearly that defendant aided Styers and provided the means and opportunity for Styers to kill Christopher, and he did so with the intent to facilitate the murder of Christopher. *See* A.R.S. § 13–301. Thus, there is substantial evidence of kidnapping, and defendant was not entitled to a judgment of acquittal on the felony murder charge.

P.2d 67, 70 (1990). Although the evidence would likely support this finding, we will analyze the evidence according to the instructions given to the jury. Therefore, the state was required to

### 4. Verdict Form for First Degree Murder

Defense counsel requested the jury be given a verdict form for first degree murder that would allow the jury to indicate how many jurors found that the murder was premeditated, how many found that it was felony murder, and how many found that it was both. The trial court refused. Defendant acknowledges that previous cases have held that such verdict forms are not *required*, but asks that we reconsider this holding. *See State v. Schad*, 163 Ariz. 411, 417, 788 P.2d 1162, 1168 (1989), *aff'd*, 501 U.S. 624, 111 S.Ct. 2491, 2504, 115 L.Ed.2d 555 (1991); *State v. Smith*, 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989); *State v. Encinas*, 132 Ariz. 493, 496–97, 647 P.2d 624, 627–28 (1982).

We again hold that it is not error to submit only one form, but we again suggest that, in appropriate cases, the trial court should consider doing so. *See Schad*, 163 Ariz. at 417, 788 P.2d at 1168; *Smith*, 160 Ariz. at 513, 774 P.2d at 817.

### 5. Lesser Included Offense of Facilitation

The trial court refused defendant's request that the jury be instructed on the elements of facilitation as a lesser included offense of first degree murder. *See* A.R.S. § 13–1004. Defendant claims that this was error.

In general, to constitute a lesser included offense, it must be impossible to have committed the greater offense without necessarily having committed the lesser offense. *See State v. Gooch*, 139 Ariz. 365, 366, 678 P.2d 946, 947 (1984); *State v. Garcia*, 176 Ariz. 231, 860 P.2d 498 (App.1993); *State v. Politte*, 136 Ariz. 117, 121, 664 P.2d 661, 665 (App.1982); *State v. Harris*, 134 Ariz. 287, 288, 655 P.2d 1339, 1340 (App.1982). In other words, "the [lesser] offense must be composed solely of some but not all of the elements of the greater crime or...." *State v. Celaya*, 135 Ariz. 248, 251, 660 P.2d 849, 852 (1983).

establish that the restraint was without consent because it was accomplished by intimidation or deception.

First degree murder requires proof that the defendant either intentionally or knowingly caused the death of another with premeditation; or "[a]cting either alone or with one or more other persons ... commits or attempts to commit ... kidnapping ..., and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." A.R.S. § 13-1105(A). The facilitation statute provides:

[a] person ... commits facilitation if, acting with knowledge that another person is committing or intends to commit an offense, such person knowingly provides such other person with means or opportunity for the commission of the offense and which in fact aids such person to commit the offense.

A.R.S. § 13-1004(A). Clearly it is possible to commit first degree murder without committing the offense of facilitation.

However, a crime may also be a lesser included offense if *"the terms of the charging document describe the lesser offense* even though the lesser offense would not always form a constituent part of the major offense charged." *Gooch,* 139 Ariz. at 366, 678 P.2d at 947 (emphasis added). In this case, defendant was charged with, and the jury was instructed on, the accomplice liability theory.[3] An accomplice is defined as a person

who with the intent to promote or facilitate the commission of an offense:

1. Solicits or commands another person to commit the offense; or

2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense.

3. Provides means or opportunity to another person to commit the offense.

A.R.S. § 13-301. An accomplice is criminally liable for the conduct of the person who commits the substantive offense. A.R.S. § 13-303(A)(3). As the jury was instructed, "[t]he law makes no distinction between a person who directly commits a crime and the person who is an accomplice."

Defendant argues that when first degree murder is charged under the accomplice statutes, facilitation is then a lesser included offense. *See Gooch,* 139 Ariz. at 366, 678 P.2d at 947. The court of appeals recently addressed this issue in *Garcia,* 176 Ariz. at 232-234, 860 P.2d at 499-501. We agree with the court of appeals' opinion in *Garcia.*

In *Garcia,* the defendant was charged with aggravated assault under the accomplice statutes, A.R.S. §§ 13-301, 13-303(A)(3). Garcia argued that *Gooch* required an instruction on a lesser included offense if the lesser offense was "described" in the indictment. Garcia claimed that facilitation was a lesser included offense because the indictment " 'described' the greater offense of aggravated assault in terms that entitled him to an instruction on facilitation." *Garcia,* 176 Ariz. at 233, 860 P.2d at 500. The court of appeals held that the indictment, which merely referred to the statutory provisions of accomplice liability, did not "describe" the lesser offense of facilitation. "In this case, the citation to the statutes in the charging document defining accomplice liability did not set out facts that described [the substantive offense] in a way that also defined [facilitation]." *Garcia,* 176 Ariz. at 234, 860 P.2d at 501.

■ Similarly, the indictment in this case refers only to the statutory provisions that impose accomplice liability. The facts con-

---

**3.** The indictment charged first degree murder as follows:

DEBRA JEAN MILKE (A), JAMES LYNN STYERS (B), and ROGER MARK SCOTT (C), on or about the 2nd day of December, 1989, intending or knowing that their conduct would cause death, with premeditation caused the death of CHRISTOPHER MILKE, a child, AND/OR DEBRA JEAN MILKE (A), JAMES LYNN STYERS (B), and ROGER MARK SCOTT (C), on or about the 2nd day of December, 1989, acting either alone or with one or more other persons committed or attempted to commit an offense, to-wit: ... KIDNAPPING, PER A.R.S. § 13-1304, and in the course of and in furtherance of such offense or immediate flight from such offense, DEBRA JEAN MILKE (A), JAMES LYNN STYERS (B), and ROGER MARK SCOTT (C), or another person caused the death of CHRISTOPHER MILKE, a child, in violation of A.R.S. §§ 13-1105, 13-1101, 13-703, 13-801, 13-203(A) and (B.2), *13-302, 13-303,* 13-304 and 13-812. (Emphasis added.) We note that the other two counts against Scott also referred to the accomplice statutes, A.R.S. §§ 13-302, 13-303.

tained in the indictment do not *describe* the lesser crime of facilitation. Even if facilitation might arguably be considered a lesser included offense of accomplice liability when the indictment "describes" the acts constituting accomplice liability, no such description appears in this indictment. Because the indictment in this case lacks such a description, we need not, and do not, decide whether another result might be reached under some other indictment. Defendant was not entitled to a facilitation instruction under this indictment and these facts. *See Gooch,* 139 Ariz. at 367, 678 P.2d at 948, *but see* E. Hardy Smith, Recent Decisions, 25 Ariz.Law. Rev. 1047, 1050–54, 1056–57 (1983) (taking the position that facilitation is a lesser included offense of the substantive offense when defendant is charged under the accomplice statutes). Defendant next argues that *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), requires the trial court to give an instruction on facilitation as a lesser included offense of first degree murder. Defendant claims that, without the facilitation instruction, the jury was left with the choice of convicting him of capital murder or letting him go free, a result the Supreme Court found unacceptable in *Spaziano v. Florida,* 468 U.S. 447, 454–57, 104 S.Ct. 3154, 3159–60, 82 L.Ed.2d 340 (1984). We disagree.

*Beck* does not entitle defendant to an instruction on a crime that is not a lesser included offense of the murder charge. *See Spaziano,* 468 U.S. at 455, 104 S.Ct. at 3159. As discussed above, facilitation is *not* a lesser included offense in this case. Therefore, *Beck* does not require the result defendant seeks.

### 6. Motion to Dismiss Aggravation/Mitigation Hearing

■ After the jury returned guilty verdicts, defense counsel filed a motion to dismiss the aggravation/mitigation hearing and

to impose a sentence other than death because the state failed to notify him *before trial* of the specific aggravating factors it intended to prove. Defendant contends that the lack of notice before trial violated his due process rights. *See* United States Const. Fourteenth Amendment; Ariz. Const. art. 2, §§ 4, 24. Defendant contends that if he had received notice *prior to trial* that the state would seek to establish that the murder was committed in an especially heinous and depraved manner, he could have rebutted the evidence during the trial phase.

■ Defendant has no due process right to receive notice of aggravating factors *prior to trial.* In *State v. Richmond,* 136 Ariz. 312, 316, 666 P.2d 57, 61, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983), we held:

> Due process requires that a defendant be advised of the specific charges against him. The information in this case gave appellant adequate notice of the charges. There is no requirement that a defendant be advised in the indictment or information of the statutory penalty, or that he be advised what aggravating circumstances will be presented at sentencing in the event of a conviction.

All defendant is entitled to *prior to trial* is notice of the specific charges against him.[4] The charges were contained in the indictment, which also put him on notice that the state would seek the death penalty because it cited A.R.S. § 13–703, Arizona's death penalty statute. Additionally, defendant knew prior to trial that the state intended to seek the death penalty because the state filed a Notice of Intent to Seek the Death Penalty on June 14, 1990—seven months prior to trial.

Even before the recent rule amendment, see note 4 below, case law required the state to disclose the aggravating factors it would seek to prove, and the evidence upon which it would rely, and to make such disclosure "suf-

4. Since defendant's trial, new rules of criminal procedure have been enacted providing that, in a capital case, the state must notify defendant of its intent to seek the death penalty not less than 30 days after arraignment. *See* Ariz.R.Crim.P. 15.-1(g)(1). Additionally, the state must disclose within 10 days after a guilty verdict in a capital first degree murder case a list of aggravating circumstances it intends to prove, the witnesses and documents it intends to use to prove those factors, and any material or information that might mitigate an aggravating circumstance. *See* Ariz.R.Crim.P. 15.1(g)(2). Even under these new rules, there is no requirement of pretrial notice of the statutory aggravating circumstances upon which the state will rely.

ficiently in advance of the hearing that the defendant will have a reasonable opportunity to prepare rebuttal." *State v. Ortiz,* 131 Ariz. 195, 207, 639 P.2d 1020, 1032 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). The state complied with that case law requirement in this case. We find no constitutional violations based on lack of notice. *Accord Ortiz,* 131 Ariz. at 208, 639 P.2d at 1033.

## 7. Constitutionality of Death Penalty Statute

Defendant contends the Arizona death penalty procedure is unconstitutional because (1) the jury does not determine the existence of aggravating factors in capital cases; (2) the sentencing discretion is not adequately channeled; and (3) A.R.S. § 13–704, which mandates death by lethal gas, is cruel and unusual punishment in violation of the Eighth Amendment. The first two challenges to Arizona's death penalty statute were again addressed and again rejected in *State v. Milke,* 177 Ariz. 118, 865 P.2d 779 (1993).

Previous cases have also rejected the third contention concerning lethal gas. *See State v. Williams,* 166 Ariz. 132, 142, 800 P.2d 1240, 1250 (1987).[5]

## 8. Death Penalty Issues

### a. *Enmund /Tison*

■■■■ Defendant argues that his death sentence is unconstitutional because the state failed to show that he was death eligible under *Enmund/Tison.*[6] In *Enmund v. Florida,* the Supreme Court held that the death penalty was unconstitutional as applied to Enmund who did not himself kill, attempt to kill, or have any "intention of participating in or facilitating a murder." *Enmund,* 458 U.S. at 798, 102 S.Ct. at 3377. In determining the appropriateness of the death penalty, the focus must be on the individual defendant's culpability. *Id. Tison v. Arizona*

held that the *Enmund* culpability requirement was also satisfied, in a felony murder case, by "major participation in the felony committed, combined with reckless indifference to human life." 481 U.S. at 158, 107 S.Ct. at 1688.

In this case, the jury found defendant guilty of conspiracy to commit first degree murder. It also found that the conspiracy was carried out. That, alone, satisfies *Enmund.* Additionally, the trial court found "that the evidence does not establish that Defendant fired the fatal shots. However, the evidence does establish, beyond a reasonable doubt, that Defendant intended to kill the victim." Additionally, in rejecting the claimed mitigating circumstance that the defendant was only a minor participant, see A.R.S. § 13–703(G)(3), the trial court stated that it would have to "virtually ignore the evidence" in order to find that Defendant played a minor role in the murder.

The *Enmund/Tison* culpability requirements were clearly satisfied in this case.

### b. Pecuniary Gain

■■■■ Defendant challenges the trial court's finding under § 13–703(F)(5) that he committed the murder in expectation of pecuniary gain. He argues that the only evidence of this factor is his own statement that he was offered $250 to drive the car. He contends that his statement was not corroborated by any independent evidence; therefore, the doctrine of corpus delicti prevents his statement from being used to establish pecuniary gain.

■■■■ Defendant points to no authority in support of his contention that the corpus delicti doctrine is applicable at the sentencing phase; nor have we found any. The doctrine provides that before an uncorroborated confession is

admissible as evidence of a crime, the state must establish the corpus delicti by prov-

---

5. The legislature has recently amended the Arizona Constitution, art. 22, § 22, to provide for execution by lethal injection. Because defendant was sentenced prior to the effective date of this amendment, November 23, 1992, he has the option of death by lethal gas or lethal injection.

6. *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

ing that a certain result has been produced and that someone is criminally responsible for that result. *Only a reasonable inference of the corpus delicti need exist before a confession may be considered.*

*State v. Gillies,* 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983) (emphasis added), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *see also State v. Daugherty,* 173 Ariz. 548, 550–51, 845 P.2d 474, 476–77 (App.1992). We hold that the doctrine of corpus delicti is inapplicable at the sentencing phase. The aggravating factor of pecuniary gain was, therefore, adequately shown by defendant's statement alone. No additional foundation was necessary before the statement could be received for purposes of proving pecuniary gain. *See State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991); *Gillies,* 135 Ariz. at 512, 662 P.2d at 1019 ("the receipt of money must be established as a cause of the murder, not a result").

### c. Especially Heinous and Depraved

[21] The trial court's special verdict meticulously detailed how it arrived at its finding that the murder was especially heinous and depraved:

In *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), the court noted that prior cases construing these terms [heinous and depraved] gave rise to five specific factors that lead to a finding that either or both terms apply: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim; (3) the mutilation of the victim; (4) the senselessness of the murder, and (5) the helplessness of the victim. 135 Ariz. at 51–53, 659 P.2d at 10–12. The list has not changed. *State v. Stanley,* [167 Ariz. 519, 809 P.2d 944] (1991). While there is nothing in the case law to suggest that the Arizona Supreme Court considers the list to be exhaustive, this Court is unwilling to look beyond these factors in an effort to determine whether this murder was committed in an especially heinous or depraved manner.

The State urges that, with the exception of the "mutilation" factor, all these factors are present. The Court finds that the

evidence fails to establish either that Defendant relished the murder or that gratuitous violence was inflicted upon the victim. Styers' alleged post-homicide reference to the victim as "that little bastard" would not suggest that Defendant "relished" the murder even if the Court were inclined to impute the statement to Defendant. A review of the cases leaves the clear impression that more is required in order to establish that the killer relished the murder. [Citations omitted.] While the medical evidence suggests that at least two of the three wounds suffered by the victim were fatal, the firing of one, or even two, unnecessary shots does not lead to the conclusion that gratuitous violence was inflicted. *See, e.g., State v. Wallace,* 151 Ariz. 362, 728 P.2d 232 (1986); *State v. Ceja* [126 Ariz. 35, 612 P.2d 491 (1980)]. On the other hand *the evidence clearly demonstrates that this was a senseless murder and that the victim was helpless.*

The next question is whether a finding that this murder was committed in an especially heinous or depraved manner can legitimately be made. *The only factors articulated in Gretzler that are supported by the evidence are (1) the senselessness of the crime, and (2) the helplessness of the victim. Neither factor, considered in isolation, will ordinarily suffice.* State v. Smith, 146 Ariz. 491, 707 P.2d 289 (1985). *Any notion that the concurrence of these two factors cannot suffice, however, is laid to rest by State v. Stanley, supra, and State v. Wallace, supra.*

... A vital consideration is whether the evidence supports the proposition that the murder in question "stands out from the norm of first degree murders...." *State v. Watson,* 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981). As articulated in *Watson,* this element appears to take the form of an overarching standard, having no connection to any specific aggravating circumstance. Numerous subsequent decisions, however, suggest that this element is part and parcel of the inquiry necessitated by § 13–703(F)(6). *See e.g., State v. Stanley,* [167 Ariz. at 529, 809 P.2d at 954]. The Court finds that this murder was both

shocking and repugnant and does, indeed, stand out above the norm of first-degree murders.

(Emphasis added.)

We agree with the trial court's legal conclusions and factual findings with respect to heinousness and depravity. We have also discussed this issue separately in the companion case of *Milke*, 177 Ariz. at 121–123, 865 P.2d at 782–784. Nothing more needs to be added here.

#### d. Alleged Double Counting of Victim's Age

■ Defendant complains that the trial court gave the victim's age double weight by using the victim's age in support of two aggravating factors—A.R.S. § 13–703(F)(6) (heinousness or depravity) and (F)(9) (age of victim). Defendant's complaint is meritless. The use of one fact to establish two aggravating circumstances is proper, provided the court, in balancing the aggravating and mitigating factors does not *weigh* the young age of the victim twice. Because it is but one fact, it cannot be weighed twice, even though it satisfies two separate aggravating factors. *See Schad*, 163 Ariz. at 419, 788 P.2d at 1170; *State v. Tittle*, 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985).

The trial court followed the law precisely, stating: "The Court concludes that it is not precluded from finding more than one aggravating circumstance based on the victim's young age and helplessness *as long as those circumstances are considered only one time in the weighing process.*" (Emphasis added.)

#### e. Non–Statutory Mitigating Circumstances

■ When a defendant is being sentenced for first degree murder, the sentencing court must consider, in addition to the mitigating circumstances of A.R.S. § 13–703(G), any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate.

*State v. McCall*, 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied*, 467 U.S. 1220,

104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Defendant must prove the existence of mitigating circumstances by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984).

■ The trial court found that none of the statutory mitigating circumstances existed. That finding is not challenged on appeal, and our review of the evidence confirms the trial court's findings in that respect. Defendant urged the following items as non-statutory mitigating factors: remorse, cooperation with the police, difficult family history or childhood, lack of prior felony convictions, employment history, history of alcohol abuse, good conduct while incarcerated and during trial, love for his mother, no threat of future criminal conduct, residual doubt regarding defendant's guilt, psychological history. Of these, the trial court found only the following constituted mitigating circumstances: cooperation with police; good conduct while incarcerated and during trial; loving relationship with his mother; and psychological history. The court concluded that his conduct while incarcerated and his relationship with his mother were not substantial factors. With one exception, our review of the evidence leads us to agree with the trial court's analysis of the proffered nonstatutory mitigating circumstances. The exception relates to the defendant's lack of a prior felony conviction.

The trial court's special verdict stated:

Defendant offers his lack of a prior felony conviction as mitigation. Defendant cites no authority, [nor] is the court aware of any, for such a claim. This mitigating circumstance does not exist.

Defendant argues, correctly we conclude, that his lack of prior felony convictions does constitute a mitigating circumstance. In *State v. Rossi (Rossi III )*, 171 Ariz. 276, 279, 830 P.2d 797, 800, *cert. denied*, — U.S. —, 113 S.Ct. 610, 121 L.Ed.2d 544 (1992), *State v. White*, 168 Ariz. 500, 512, 815 P.2d 869, 881 (1991), *cert. denied*, — U.S. —, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992), and *State v. Lavers*, 168 Ariz. 376, 395, 814 P.2d 333, 352, *cert. denied*, — U.S. —, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991), this court considered a defendant's lack of a prior criminal or felony

record a relevant mitigating circumstance. We have also considered it in the cases of defendant's co-defendants, as did the trial courts in those cases. *Milke*, 177 Ariz. at 122–123, 865 P.2d at 783–784; and *State v. Styers*, 177 Ariz. 104, 865 P.2d 765 (1993).

We have also held, however, that arrests or misdemeanor convictions may be considered when lack of felony convictions "is advanced as a mitigating factor." *Rossi III*, 171 Ariz. at 279, 830 P.2d at 800; *Lavers*, 168 Ariz. at 395, 814 P.2d at 352. Although defendant has no prior felony convictions, he does have a criminal history of arrests and misdemeanors. Defendant has three misdemeanor charges that are over 25 years old, an arrest for assault in 1982, and a misdemeanor conviction for public indecency in 1985. The presentence report, which may properly be considered on matters of mitigation, shows that defendant has admitted to four arrests between 1972–74 for driving under the influence. These factors may be considered in determining the weight to give to the mitigating evidence of lack of a felony conviction. *See Lavers*, 168 Ariz. at 395, 814 P.2d at 352.

Based upon our review of all the proffered mitigating evidence, we agree with all aspects of the trial court's consideration of statutory and non-statutory mitigating circumstances except we conclude that lack of a prior felony record is a non-statutory mitigating circumstance. *See Rossi III*, 171 Ariz. at 279, 830 P.2d at 800; *White*, 168 Ariz. at 512, 815 P.2d at 881; *Lavers*, 168 Ariz. at 395, 814 P.2d at 352.

■ Finally, regarding mitigating circumstances, the trial court considered the giving of a felony murder instruction even though defendant did not suggest it as a mitigating circumstance. "[T]he fact that a felony-murder instruction was given to the jury is not relevant 'where the defendant intended to kill the victim or where the defendant knew with substantial certainty that his conduct would cause death.'" *Gillies*, 135 Ariz. at 513, 662 P.2d at 1020. Here defendant was found guilty, not only of felony murder (at the least), but of conspiracy to commit first degree murder. Defendant's conduct in this whole affair was not insignifi-

cant. We concur with the trial court's analysis of the weight to be given to the felony murder instruction in this case.

### f. Independent Review

■ This court independently reviews the record to determine whether the death penalty is appropriate. *See State v. Watson*, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981). We agree with the trial court's findings of three separate statutory aggravating circumstances. Therefore, under Arizona law, death is mandated unless there are mitigating circumstances sufficiently substantial to call for leniency. Like the trial court, we find the mitigation lacking, even though we consider one more non-statutory mitigating circumstance than did the trial court. Under the circumstances of this case this additional mitigating circumstance has minimal significance. The death penalty is appropriate in this case under Arizona law.

### DISPOSITION

We have reviewed the record for fundamental error and found none. Because we conclude defendant was properly convicted and sentenced, we affirm his convictions and sentences on all counts.

CORCORAN, ZLAKET and MARTONE, JJ., and RUTH V. McGREGOR, Court of Appeals Judge, concur.

FELDMAN, C.J., did not participate in the determination of this matter. Pursuant to Ariz. Const. art. VI, § 3, RUTH V. McGREGOR, Judge, Court of Appeals, Division One, was designated to sit in his stead.