NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

STATE OF ARIZONA, *Appellee,*

*v.*

RAUL VARELA, *Appellant.*

No. 1 CA-CR 12-0643
FILED 07-15-2014

———————————————

Appeal from the Superior Court in Maricopa County
No. CR2009-007018-001
The Honorable Pamela Svoboda, Judge

**AFFIRMED**

———————————————

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jana Zinman
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Terry J. Reid
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Donn Kessler delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Margaret H. Downie joined.

---

**K E S S L E R**, Judge:

¶1        Raul Varela appeals his convictions and sentences for two counts of intentional or knowing child abuse.  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2        Varela and his wife, Tricia Varela, were tried together on multiple charges of child abuse stemming from their physical treatment of their recently-adopted daughter, E., when she refused to use the toilet. Specifically, in Count 3, the State alleged Varela intentionally or knowingly endangered E.'s life in violation of Arizona Revised Statutes ("A.R.S.") section 13-3623(A) (2010)[1] because he did not seek medical care until two days after Tricia injured E. during a three-hour "power struggle" that involved physically restraining E. on the toilet and subsequently struggling with her in a closet and striking her with a shoe. In Count 6, the State charged Varela with intentional or knowing child abuse in violation of A.R.S. § 13-3623(B) based on previous instances where he bruised E. by forcibly restraining her on the toilet.

¶3        Detectives JH and AY conducted an interview with Varela the day after E. was taken to the hospital ("the Interview").  At the time of the Interview, the detectives mistakenly believed E.'s arm and leg were fractured. Detective JH later testified at trial this belief was incorrect and E. had no broken bones.[2]  Upon informing Varela of E.'s broken limbs, Varela made incriminating statements.  Varela moved to preclude specific

---

[1]      We cite the current version of the applicable statute when no revisions material to this decision have since occurred.

[2]      Detective JH explained that at the time of the Interview the hospital staff considered it possible that E.'s arm and leg were broken and had ordered x-rays to confirm this suspicion.  When he interviewed Varela, JH was not aware of the x-ray results.

statements made by the detectives and Varela during the Interview, some of which regarded E.'s purportedly fractured arm and leg. After hearing argument from counsel, the court granted the motion in part and ordered portions of the Interview redacted.

**¶4** A jury found Varela guilty of the charged offenses. The court sentenced Varela to a mitigated sentence of twelve years' flat-time imprisonment for the conviction on Count 3, a class two felony, dangerous crime against children, and domestic violence offense. For the conviction on Count 6, a class four felony and domestic violence offense, the court imposed the presumptive term of two-and-a-half years in prison and ordered the sentences to run concurrently. Varela timely appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1) (2003), 13-4031 (2010), and -4033(A)(1) (2010).

**DISCUSSION**

I. Sufficiency of the Evidence

**¶5** Varela argues there is insufficient evidence to support the jury's conclusion that he endangered E.'s health by failing to seek medical care. In challenging the sufficiency of the evidence, Varela contends no evidence was presented at trial showing he possessed the necessary *mens rea* to constitute a violation of A.R.S. § 13-3623(A), and he asserts no evidence presented indicated the delay in seeking medical care of E. "increased the potential for death or serious physical injury."

**¶6** The sufficiency of evidence is a question of law which we review *de novo*. *State v. West*, 226 Ariz. 559, 562, ¶ 15, 250 P.3d 1188, 1191 (2011). Our review is limited to whether substantial evidence exists to support the verdict. *State v. Scott*, 177 Ariz. 131, 138, 865 P.2d 792, 799 (1993); *see also* Ariz. R. Crim. P. 20(a) (directing courts to enter judgment of acquittal "if there is no substantial evidence to warrant a conviction."). Substantial evidence "is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990) (quoting *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)).

**¶7** Further, when addressing a sufficiency of the evidence argument, "[w]e construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." *State v. Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111

(1998). We will reverse only if there is a complete absence of probative facts to support the conviction. *State v. Scott*, 113 Ariz. 423, 424-25, 555 P.2d 1117, 1118-19 (1976). We will not weigh the evidence as that is the function of the jury. *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). "The finder-of-fact, not the appellate court, weighs the evidence and determines the credibility of witnesses." *State v. Cid*, 181 Ariz. 496, 500, 892 P.2d 216, 220 (App. 1995). No distinction exists between circumstantial and direct evidence. *State v. Stuard*, 176 Ariz. 589, 603, 863 P.2d 881, 895 (1993).

¶8　　　　To sustain a conviction on Count 3, the State had to prove beyond a reasonable doubt that, "[u]nder circumstances likely to produce death or serious physical injury," Varela's intentional or knowing failure to seek medical care for E. for two days after her power struggle with Tricia endangered E.'s "person or health." *See* A.R.S. § 13-3623(A). Varela argues he could not have known E.'s symptoms were indicative of an illness or injury that required immediate medical treatment, and none of the State's witnesses stated the symptoms for which E. was admitted to the hospital were such that a reasonable person would have immediately sought medical help. We disagree. There is evidence in the record to support the assertion Varela intentionally or knowingly withheld medical care for E. for two days under circumstances likely to kill or seriously injure her.

¶9　　　　Tricia explained to Detective JH that E. had issues going to the bathroom, and she and Varela would restrain E. on the toilet for up to an hour while "pushing her mid-section into her legs." E. would struggle and try to get away. During his Interview, Varela admitted that prior to E.'s struggle with Tricia, E.'s belly was distended and she had developed bruises from being restrained earlier in the week. He agreed that, generally, upon noticing a child's stomach is distended and hurting, a reasonable person would take the child to the doctor. He agreed E.'s fever, vomiting, and withholding stool and urine were all red flags indicating something was wrong. And he further admitted taking E. to the doctor was going to "raise some flags" based upon the bruising to her arms and legs, and he knew when he took E. to the hospital that CPS would be called.

¶10　　　　Moreover, the trial evidence revealed that when E. arrived at the hospital she was bruised, crying, whimpering, pale, and not moving. Because the hospital did not have the appropriate facilities, staff personnel determined E.'s critical condition required she be transferred to the Maricopa Medical Center's pediatric intensive care unit. There, doctors

determined E.'s abdomen was bruised and distended with decreased bowel sounds, her white cell count indicated possible infection, and there were signs she was dehydrated. The abdominal bruising was particularly concerning because the lack of bones in that area of the body make accidental bruising difficult. This bruising, in addition to E.'s other symptoms, indicated possible trauma and child abuse. In addition, internal bleeding was later found in the muscle layers of E.'s abdomen, which resulted in an internal abscess that had to be surgically drained to resolve any infection. E.'s treating physician agreed her condition was life-threatening, and E. remained in the pediatric intensive care unit for approximately one month.

¶11        Doctor Kirsch, a pediatrician who evaluates patients for potential child abuse, opined that E.'s abdominal injuries were caused by trauma, specifically, "significant pressure," "crush injury," and "squeezing." She further testified E. was "extremely critical ill" and had E. gone untreated "it is possible that she would have died."

¶12        Based upon Varela's admissions during the Interview, in addition to the foregoing trial testimony, the jury could reasonably conclude Varela delayed seeking medical care for E. until her injuries became life-threatening because he feared her bruising would lead to allegations of child abuse. The evidence therefore supports the jury's determination Varela intentionally or knowingly withheld medical care for E. thereby endangering her health. Sufficient evidence supports Varela's conviction on Count 3.

II.        Admission of Statements

¶13        Varela argues the trial court erred in admitting portions of the Interview that occurred after he was accused of breaking E.'s arm and leg. He claims these portions of the Interview were more prejudicial than probative and caused confusion as to the context and meaning of his statements.

¶14        Because Varela failed to present this issue below, we review for fundamental error. *See State v. Edmisten*, 220 Ariz. 517, 522, ¶ 11, 207 P.3d 770, 775 (App. 2009). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)). To obtain a reversal, Varela must also

demonstrate the error caused prejudice. *Id*. at ¶ 20. Prejudice must be shown in the record and may not be based solely on speculation. *See State v. Munninger*, 213 Ariz. 393, 397, ¶ 14, 142 P.3d 701, 705 (App. 2006). "Before we may engage in a fundamental error analysis, however, we must first find that the trial court committed some error." *State v. Lavers*, 168 Ariz. 376, 385, 814 P.2d 333, 342 (1991). Varela, however, fails to persuade us the trial court erred, much less fundamentally erred to Varela's prejudice, in failing to *sua sponte* redact certain comments made by Varela and the detectives after they misinformed him of E.'s broken arm and leg.

¶**15**        Varela primarily argues the jury was confused and misled by the challenged statements because the comments were based on a combination of both true and false facts. We note that this apparent prejudice to Varela, however, is purely speculative and not sufficient for reversal under fundamental error review. Further, Varela's assertion the jury was confused by his admission in the Interview that the purportedly broken bones constituted abuse is not supported by the record. Varela admitted in the Interview the bruising alone was abuse, there is "no human being that deserves the bruising and pain she's going through" and the bruising would "raise flags."

¶**16**        Given that Arizona law permits intentional lying by law enforcement during interrogations "so long as the suspect's will is not overborne" — and Varela does not argue his will was overcome during the Interview — we cannot conclude the detectives' innocent statements regarding E.'s broken arm and leg required the trial court to *sua sponte* redact the comments that Varela now challenges. *See State v. Huerstel*, 206 Ariz. 93, 106, ¶ 54, 75 P.3d 698, 711 (2003) (stating that tactics such as lying about the strength of the evidence is "permissible so long as the suspect's will is not overborne.").

¶**17**        Varela refers to his answer "Monsters, monsters" in response to Detective JH's question, "What do you think of the parents of this child?" as confusing the jury as to whether the broken bones or the bruising constituted abuse. We disagree. The record clearly reflects that when JH posed the question to Varela, JH was showing him pictures of E.'s injuries, which as detective JH explicitly testified, did not consist of broken bones.

¶**18**        Varela also challenges the admission of the following dialogue at the conclusion of the Interview:

Detective [JH]: What if you were to leave your son, and one of your sons let's say with a neighbor kid for a day, um the neighbor, for a day, because you and your wife want to go out. And you get a call um from the Goodyear Police Department to tell you that we've arrested the neighbor because he's um abused our child for whatever reason. And when we get you to the PD we just say, well we're going to hate to do this but we're going to have to show you these photos of your son. And these are the photos that we show you of your son. What . . . would your response be?

Mr. Varela: It would be devastating.

Detective [JH]: What would you want to have happen to your neighbor?

Mr. Varela: Okay here's where we get kinda weird . . .

Detective [JH]: No be honest, I want to know the honest truth. What would you want to do to . . . that neighbor?

Mr. Varela: I would want to hurt them.

Detective [JH]: You'd probably want to kill 'em right?

Mr. Varela: Short of killing them, hurt them.

Detective [JH]: And what would you want law enforcement to do to him?

Mr. Varela: You know what? I'm . . . about second chances. And I'm not just saying because of this.

Detective [JH]: Okay, wait a minute. Now see you're being contradictory. You want to kill 'em, but then you wanna give 'em a second chance.

Mr. Varela: Well [if] you're asking me what my first reaction . . . My first reaction is to kill, is to just . . . get my hands, get my hands . . . around him. But in reality, what would I wanna do, what would I do? I mean I would wanna see . . . why he did that. Why and see if I can help.

Detective [JH]: Because your son didn't listen. Because your son took uh some cookies from the cookie jar and he said no

7

don't because you need to eat dinner first. And so because of that he got enraged and that's what happened to your son. If that was his reason, what would you do?

Mr. Varela: Um . . .

Detective [JH]: Are you okay with giving him a second chance?

Mr. Varela: Probably would give him a second chance.

Varela argues the above statements should have been precluded because they were not probative based upon the lack of trial evidence that Varela injured E. out of rage, improperly insinuated he valued his biological children more than E., and "only served to highlight the detectives oft stated belief that . . . Varela was minimizing his conduct."

¶19        Detective JH testified he believed Varela was minimizing his conduct by taking measures before E. was hospitalized. This conduct included applying lotion to E., giving her Epsom salt baths and applying ice to hide her bruises and cuts, and giving her suppositories to reduce her fever. Therefore, the quoted portion of the Interview was probative as to Varela's minimizing of his actions. Varela's remaining examples of error in the admission of the quoted portion of the Interview do not go to the foundation of the case, take away a right essential to his defense, or rise to a level that he could not possibly have received a fair trial. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607 (quoting *Hunter*, 142 Ariz. at 90, 688 P.2d at 982).

¶20        Based on the foregoing, we cannot conclude the court fundamentally erred in failing to *sua sponte* preclude portions of the Interview after Varela was mistakenly informed of E.'s broken bones on the basis the evidence was unduly prejudicial. *See* Ariz. R. Evid. 403 (stating relevant evidence is subject to exclusion "if its probative value is substantially outweighed by a danger of . . . unfair prejudice [or] confusing the issues . . . ."). In any event, Varela fails to sufficiently establish any resulting prejudice.

III.    Prosecutorial Misconduct

¶21        Varela argues the prosecutor's comments during opening and closing arguments amounted to misconduct that infected the entire proceedings and denied him a fair trial. As Varela concedes, he did not

object at trial to the comments. As a result, our review is limited to determining whether fundamental error occurred.

¶22 To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Moody*, 208 Ariz. 424, 459, ¶ 145, 94 P.3d 1119, 1154 (2004) (citation omitted). That is, a defendant must demonstrate the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974). "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184 (1998) (citations omitted).

¶23 Varela first points to the following remark the prosecutor made in opening statements:

> You will hear the Varelas presented to them the image of a perfect family. They had two biological sons. They made a very big deal about their church attendance. Their willingness to take on four girls in need seemed only to enhance their image as a solid, caring family that had everything going for them.

Varela contends the comment was improper because no evidence at trial was presented that they attended church or adopted E. and her three sisters for the purpose of enhancing their image. We reject this argument.

¶24 First, Tricia's counsel commented during opening statements that the Varelas were "active in the church" and "this was a perfect family." Varela's counsel also stated the couple was "active in church." Furthermore, the prosecutor's comment that the Varelas' adoption "seemed" to enhance their image was a reference the jury could

reasonably make based upon the trial evidence,[3] and the statements were not a comment on Varela's guilt. Based on the foregoing, we do not find any impropriety in the prosecutor's challenged remarks.

¶25        Varela next contends the prosecutor attempted to mislead the jury by remarking in opening statements that E.'s injuries were so bad that the hospital they took her to was unable to adequately handle her level of trauma:

> But it was actually her internal injuries that were of real concern to the doctors. They were so bad, that . . . although the Varelas initially went to West Valley hospital, the doctors at West Valley decided that [E.] needed to be moved so she was taken to Maricopa [M]edical [C]enter, which is a level one trauma center. This was something that was bad enough that West Valley didn't feel they [could] deal with it.

During the trial, a nurse testified E. was transferred to Maricopa Medical Center because the hospital "does not offer child care for hospitalization. And in this condition, the child had to go to a higher [level] of care, which was another facility, for her length of stay." Because E. needed to be hospitalized, and because the hospital lacked the facilities to treat this level of child trauma, the State's characterization of the hospital as unable to provide her with proper care was not misleading. Even if the statements were improper, Varela would need to establish "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [Varela] a fair trial." *Moody*, 208 Ariz. at 459, ¶ 145, 94 P.3d at 1154. No such prejudice exists given the nature of E.'s injuries.

¶26        Varela also argues the following opening statement by the prosecutor amounted to misconduct:

---

[3]    There was significant testimony at trial that a number of the Varelas' church friends had adopted children. Tricia also testified she and her husband, "[a]fter speaking with several of our friends . . . [and] our pastor . . . and praying about it . . . we really felt that we [would] be able to fill that need for the kids." Also, the Varelas' pastor testified that he attended a party celebrating the Varelas' adoption, and there was "a lot of happiness, a lot of joy."

And you will hear from those medical personnel who treated [E.] during that month. [E.] was in the hospital due solely to injuries inflicted by Tricia Varela. And due to her lack of medical care.

Even assuming Varela is correct that the comments were improper because there was no medical evidence E. was hospitalized due to the Varelas' delay in seeking treatment, the trial evidence presented allowed the jury to reasonably infer that the delay in seeking medical care for E. was at least a contributing factor to her prolonged hospitalization. *See supra* ¶¶ 9-11. Therefore, the prosecutor's remark was not improper.

¶27 Varela further asserts the prosecutor appealed to the jury's biases by sneering at Varela's religious involvement and saying: "Their pastor, freakishly tanned pastor who was so dazzled by them taking in these four unfortunate children." Although we can find no appropriate purpose for commenting on the pastor's physical appearance, it was not significant enough to constitute misconduct. *See Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271-72 (1984) (noting prosecutorial misconduct is not merely "legal error, negligence, mistake, or *insignificant impropriety*, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial . . . ." (emphasis added)).

¶28 Finally, Varela contends the prosecutor's reference during closing arguments to Varela's statement during the Interview that he was a "monster" was improper because the statement was made in response to the detectives' false information regarding E.'s broken bones. As we have already determined, *see supra* ¶ 17, the "monster" comment was not made regarding Varela's belief that E.'s bones were broken. We thus summarily reject this argument.

¶29 In sum, we find none of the challenged statements by the prosecutor amounted to misconduct, let alone to the extent that it denied Varela a fair trial and required the trial court to *sua sponte* declare a mistrial or take other corrective action. Therefore, we will not reverse on that basis. Furthermore, the court instructed the jury that the attorneys' statements were not evidence. We presume the jurors followed that instruction. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68, 132 P.3d 833, 847 (2006); *State v. Bowie*, 119 Ariz. 336, 340, 580 P.2d 1190, 1194 (1978) ("Any possible prejudice from the opening statement was overcome by the court's cautionary instructions that evidence did not come from the attorneys and that the verdict must be determined only by reference to the

evidence . . . ."); *State v. Ramirez*, 178 Ariz. 116, 127, 871 P.2d 237, 248 (1994) ("[T]here is no presumption that jurors will disobey instructions given them by the court." (citation omitted)).

**CONCLUSION**

**¶30** Varela's convictions and sentences are affirmed. Varela's motion to vacate the court's order requiring Varela to pay for the costs of DNA testing pursuant to A.R.S. § 13-610 (Supp. 2013), *see State v. Reyes*, 232 Ariz. 468, 472, ¶ 14, 307 P.3d 35, 39 (App. 2013), is moot. The superior court entered a minute entry dated December 17, 2003 correcting its previous order regarding payment of DNA testing.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh